# UNITED STATES DISTRICT COURT
## THE DISTRICT OF COLUMBIA

DNM SEAFOOD, INC.     )
           )
    **Plaintiff**    )    CASE NUMBER  1:05CV02181
           )
**v.**         ) ( JUDGE: Emmet G. Sullivan
           )
**PRUITT'S SEAFOOD, INC.,** *et al.* )    DECK TYPE: Contract
           )
    **Defendants**  )    DATE STAMP: 11/07/2005

## MOTION TO TRANSFER

Defendants, Pruitt's Seafood, Inc. ("Pruitt's Seafood"), and Stewart B. Pruitt ("Mr. Pruitt") (collectively "Defendants"), by counsel, move this Court to transfer this case to the United States District Court for the Eastern District of Virginia (Norfolk Division), pursuant to the forum-selection clause in the parties' contract and pursuant to the authority granted this Court by 28 USC § 1404(a).

### Factual Background

Plaintiff's President, Sung Jin Kim ("Mr. Kim"), resides in Springfield, Virginia. Pruitt's Seafood is a Virginia corporation. *See* Affidavit of Stewart B. Pruitt attached as Exhibit A. Mr. Pruitt is a resident of Nassawadox, Virginia, and is the President of Pruitt's Seafood. *See* Exhibit A. This lawsuit arises out of the sale by Pruitt's Seafood to Plaintiff of a retail fish market business and related assets located in the District of Columbia ("the Business"). The assets sold to Plaintiff included without limitation, the barges, cook-boat, coolers, freezers, equipment, trade name, goodwill, and dock lease associated with the Business. Complaint ¶ 8.

The Complaint alleges that Plaintiff relied upon certain false representations made by Mr. Pruitt regarding earnings he derived from his employment by, and ownership interest in, Pruitt's Seafood, in negotiating a purchase price of $3,000,000 for the Business. Complaint ¶ 6.

Specifically, the Complaint alleges that Mr. Pruitt falsely stated that he personally received $1,000,000 per year from the Business, "derived from his employment with, and ownership interest in, Pruitt's Seafood" and that the $3,000,000 purchase price was based upon his existing earnings level. Complaint ¶ 11. According to Plaintiff, Mr. Kim requested, but did not receive, copies of Mr. Pruitt's personal tax returns in order to verify Mr. Pruitt's alleged representations regarding his earnings. Complaint ¶ 12.

The Complaint alleges that all discussions between Mr. Kim and Mr. Pruitt occurred in the District of Columbia. Complaint ¶ 7. To the contrary, although some meetings took place in the District of Columbia, the majority of discussions took place in Virginia at Defendants' accountant's office or via telephone while Mr. Pruitt was in Virginia. *See* Exhibit A. Settlement took place on May 4, 2004, in Annandale, Virginia. Complaint ¶ 13.

Pursuant to the parties' Sales Agreement dated April 28, 2004, Plaintiff paid to Pruitt's Seafood a lump-sum down payment of $650,000 and executed two promissory notes in favor of Pruitt's Seafood totaling $2,350,000. Complaint ¶ 13. A copy of the Sales Agreement is attached as Exhibit B. Paragraph 15 of the Sales Agreement provides that Virginia law applies. *See* Exhibit B.

According to the Complaint, Plaintiff has paid in full one of the promissory notes in the amount of $150,000 and has made "substantial payments" on the $2,200,000 promissory note. Complaint ¶ 13. A copy of the $2,200,000 promissory note ("Promissory Note") is attached as Exhibit C. Under the Promissory Note, payments are due and owing to Pruitt's Seafood in Virginia. The Promissory Note states that Virginia law applies and contains the following clause regarding jurisdiction:

> The Maker hereby submits to the jurisdiction and venue of the Circuit Court of
> the City of Virginia Beach and the United States District Court for the Eastern

District of Virginia, Norfolk Division, and agrees that the Noteholder may, at its option, enforce its rights under the Note in such courts.

*See* Exhibit C.

The Promissory Note is secured by certain collateral associated with the Business, pursuant to the terms of a Security Agreement dated May 3, 2004. *See* Security Agreement attached as Exhibit D. Under the Security Agreement, Mr. Kim and his wife have pledged their assets, which would include their personal property in Virginia. The Security Agreement states the following with respect to the law governing the Security Agreement:

> This Security Agreement and the other related documents (a) **have been negotiated, executed and delivered in the Commonwealth of Virginia,** and (b) together with the rights and obligations of the parties hereunder and thereunder, shall be governed by, and construed and performed in accordance with, the laws of the Commonwealth of Virginia, except to the extent that the UCC provides for the application of other law with respect to the other collateral.

*See* Exhibit D (emphasis added). The Security Agreement contains the following clause regarding jurisdiction:

> The Debtor irrevocably submits to the non-exclusive jurisdiction of the Circuit Court of the City of Virginia Beach, Virginia and the United States District Court for the Eastern District of Virginia, and agrees that the Secured Party may, at its option, enforce its rights under the Security Agreement in such courts.

*See* Exhibit D.

At the time of settlement, the parties also executed a Management Agreement, pursuant to which Plaintiff was granted the authority to manage the Business. Complaint ¶ 23. A copy of the Management Agreement is attached as Exhibit E. The Management Agreement states that it terminates upon the earlier of (i) a valid assignment of the lease, or (ii) 60 days after settlement. Complaint ¶ 23.

In the Complaint, Plaintiff contends that the true value of the Business is "substantially lower than $3,000,000." Complaint ¶ 18. Plaintiff asserts that but for Defendants'

misrepresentations, it would not have entered into the Sales Agreement nor incurred additional expenses of $300,000 to repair defects in the barges and cook-boat. Complaint ¶ 19. Plaintiff asserts that the Sales Agreement fails for lack of consideration because Pruitt's Seafood did not obtain a requisite assignment of the existing dock lease agreement between the District of Columbia and Pruitt's Seafood, pursuant to the terms of the Management Agreement. Complaint ¶¶ 22, 24. Plaintiff seeks rescission of the Sales Agreement and related documents, or in the alternative, compensatory damages. Complaint ¶¶ 20-21, 26. Plaintiff also seeks compensatory damages stemming from an alleged breach of Pruitt's Seafood's obligation under the Sales Agreement to convey equipment (in particular, the barges and cook-boat) in good working order. Complaint ¶¶ 27-28.

Plaintiff is currently in default under the Promissory Note for failing to make payments when due and based upon its failure to timely make payments to Pruitt's Seafood and Plaintiff's vendors. *See* Exhibit A. Under the Promissory Note, Plaintiff's failure to make payments when due or to pay debts as they become due constitute events default, pursuant to which the entire unpaid principal balance becomes due at the option of Pruitt's Seafood upon proper notice to Plaintiff. On September 1, 2005, and September 30, 2005, proper notice was given to Plaintiff pursuant to the terms of the Promissory Note. *See* September 1, 2005, Notice of Default and September 30, 2005, Notice of Default and Demand for Cure collectively attached as Exhibit F. Pruitt's Seafood intends to file a Counterclaim against Plaintiff for breach of the Promissory Note.[1] Pursuant to the terms of the Promissory Note and Security Agreement, Pruitt's Seafood has the absolute right to bring such an action in the Eastern District of Virginia (Norfolk Division).

---

[1] Pursuant to Fed. R. Civ. P. 13(a), such Counterclaim is compulsory because it arises out of the transaction or occurrence that is the subject matter of this action brought by Plaintiff.

Sang K. Park, the attorney who represented Plaintiff in the sale of the Business, is located in Annandale, Virginia. Robey Hackney represented Pruitt's Seafood in sale of the Business. Mr. Hackney is no longer with the law firm of Williams Mullen Hofheimer Nusbaum and is still located in Norfolk, Virginia.

## Argument

I.    LEGAL STANDARD

A.    Forum-Selection Clause in Contract

A federal court sitting in diversity should apply federal law in adjudicating a motion to transfer a case to a venue provided in a contractual forum-selection clause. *Stewart Org. v. Ricoh*, 487 U.S. 22, 28 (1988). Ordinarily, a court evaluating a motion to transfer venue "must first determine whether there exists an adequate alternative forum and, if there is, the court then must weigh the relative conveniences to the parties against the presumption of the plaintiff's forum selection. This analysis, however, changes when the parties have agreed to a forum-selection clause." *Overseas Partners, Inc. v. Progen Musavirlik Yonetim Hizmetleri, Ltd.*, 15 F. Supp. 2d 47, 54 (D.D.C. 1998).

Venue is limited when the parties have previously contracted via a forum selection clause to settle their disputes in a particular forum. *National Dev. Corp. v. Fenetres MQ, Inc.*, 1998 WL 34313581, at *2 (D.D.C. 1998) (copy attached). "[W]hen the parties have agreed to a forum-selection clause... the forum clause should control absent a strong showing that it should be set aside." *Overseas Partners*, 15 F.Supp. 2d at 54 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). In fact, a forum selection clause is prima facie valid and should be enforced as long as it is not obtained by fraud or coercion, is not unconscionable, and does not

contravene public policy. *Scherk v. Alberto-Culver Company,* 417 U.S. 506, 521 (1974); *M/S Bremen,* 407 U.S. at 10, 13; *National Dev.,* 1998 WL 34313581, at *2.

A forum selection clause is "made in an arm's length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts." *M/S Bremen,* 407 U.S. at 12; *Commerce Consultants Int'l v. Vetrerie Riunite,* 867 F.2d 697, 699, 276 U.S. App. D.C. 81, 83 (D.C. Cir. 1989). Even where a forum selection clause was not a product of negotiation, the United States Supreme Court applied a presumption in favor of enforcing the forum selection clause. *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 595 (1991).

To invalidate a forum selection clause, the party challenging its enforcement bears the burden of demonstrating "that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." *M/S Bremen,* 407 U.S. at 18; *see also 2215 Fifth Street Assocs. v. U-Haul Int'l,* 148 F. Supp. 2d 50, 54-55 (D.D.C. 2001); *National Dev.,* 1998 WL 34313581, at *2; *Overseas Partners,* 15 F. Supp. 2d at 54.

When considering a transfer of venue in the case of a permissive forum selection clause, a court should balance the parties' selection of a forum with the factors set forth in § 1404(a). *Id.* Under 28 U.S.C. §1404(a), a district court can transfer a civil action "for the convenience of the parties and witnesses, in the interest of justice to any other district where the action might have been brought." The United States Supreme Court has explained that a "forum selection clause, which represents the parties' agreement as to the most proper forum," while not dispositive,

should be given appropriate consideration, in connection with § 1404(a). *Stewart Org.*, 487 U.S. at 29.[2]

### B.    Forum Non Conveniens

28 USC § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." This Court has discretionary authority to transfer a case to pursuant to this statute, when such transfer is appropriate. *See e.g., Stewart Org.*, 487 U.S. at 29; *Initiative and Referendum Institute v. United States Postal Service*, 2001 WL 849364 at *2 (D.D.C. 2001) (copy attached). Transfer is appropriate here.

Motions to transfer are analyzed on a case-by-case basis, and this Court routinely applies a number of factors that identify the private and public interests in such a transfer. *Wilderness Society v. Babbitt*, 104 F. Supp. 2d 10 (D.D.C. 2000); *Initiative and Referendum Institute* at *2-3; *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48 (D.D.C. 2000). The private considerations include (1) plaintiff's choice of forum; (2) defendant's choice of forum; (3) where the claim arose; (4) convenience of the parties; (5) convenience of witnesses, though only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof. The public interest considerations involve (1) the transferee Court's familiarity

---

[2] Federal law in the Eastern District of Virginia likewise recognizes the validity of forum selection clauses: "Where two parties, pursuant to arm's length negotiations by experienced and sophisticated businessmen, have agreed to bring any disputes in a particular forum, and where there is no compelling and countervailing reason making enforcement unreasonable, the forum selection clause is prima facie valid and is to be honored by the parties and enforced by the courts." *Regency Photo & Video v. America Online*, 214 F. Supp. 2d 568, 572 (E.D. Va. 2002) (citing *M/S Bremen*, 407 U.S. 1); *see also Allianz Ins. Co. v. Cho Yang Shipping*, 131 F. Supp. 2d 787, 791 (E.D. Va. 2000) (affirming validity and enforceability of forum selection clauses); *Lawler v. Schumacher Filters*, 832 F. Supp. 1044, 1053 (E.D. Va. 1993) (enforcing forum selection clause despite hardship and expense of transporting witnesses to Germany, finding that plaintiff should have anticipated such expenses and hardship when agreeing to forum selection clause). "While plaintiff's choice of forum is normally a significant factor weighing against transfer, where the § 1404(a) motion is based largely on the existence of a valid forum-selection clause, plaintiff's choice of forum is given considerably less deference." *One Beacon Ins. Co. v. JNB Storage Trailer Rental Corp.*, 312 F. Supp. 2d 824 (E.D. Va. 2004).

with the governing laws; (2) relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home. The vast majority of these factors support transfer.

## II.    THE CONTRACTUAL FORUM-SELECTION CLAUSE AND THE OTHER FACTORS SUBSTANTIALLY WEIGH IN FAVOR OF TRANSFER

As a threshold matter, this action could have been brought against Defendants in the Eastern District of Virginia. Jurisdiction is obtained pursuant to 28 U.S.C. §§ 1332 and 1446 and the terms of the Promissory Note and the Security Agreement. *See* Exhibits C and D. Venue would be proper in the Norfolk Division of that Court pursuant to 28 USC § 1391(a)(1) and (2).

### A.    Forum-Selection Clause

The forum-selection clauses in the Promissory Note and Security Agreement clearly provide for Pruitt's Seafood, at its option, to enforce its rights in the Norfolk Division. Plaintiff seeks to rescind its obligations under the Promissory Note and Security Agreement, and Pruitt's Seafood intends to file a Counterclaim against Plaintiff as a result of its default under the Promissory Note. Pursuant to the contractual forum-selection clauses, Pruitt's Seafood is entitled to have the parties' disputes heard in Norfolk.

The forum-selection clauses are prima facie valid and should be enforced as long as they were not obtained by fraud or coercion, are not unconscionable, and do not contravene public policy. *Scherk*, 417 U.S. at 521; *M/S Bremen*, 407 U.S. at 10, 13; *National Dev.*, 1998 WL 34313581, at *2. In the present case, Plaintiff was represented by counsel in the negotiations and there is no allegation of any fraud with respect to the forum-selection clauses.

Nor would the contractual forum be "so gravely difficult and inconvenient that [Plaintiff] will for all practical purposes be deprived of [its] day in court," as set forth below. *M/S Bremen*,

407 U.S. at 18; *see also 2215 Fifth Street Assocs.*, 148 F. Supp. 2d at 54-55; *National Dev.*, 1998 WL 34313581, at *2; *Overseas Partners*, 15 F. Supp. 2d at 54.

B.    Private Factors Under 28 USC § 1404(a)

1.    While Plaintiff's choice of forum is ordinarily entitled to substantial deference, *Babbitt*, 104 F. Supp. 2d at 12, where Plaintiff has contractually agreed to litigate in Norfolk, the deference traditionally accorded plaintiff's choice of forum is considerably decreased. *See OneBeacon Ins. Co. v. JNB Storage Trailer Rental Corp.*, 312 F. Supp. 2d 824 (E.D. Va. 2004).

2.    The Eastern District of Virginia is, manifestly, Defendants' preferred venue for this proceeding.  Not only was this forum included in the Promissory Note and Security Agreement, Defendants are located there and therefore seek transfer to that District.

3.    Since the majority of negotiations between the parties took place in Virginia, *see* Exhibit A, the contract documents were all signed in Virginia, and closing occurred in Virginia, the material actions in this case took place in Virginia, not the District of Columbia. This is evidenced by the fact that the Security Agreement specifically states that it and other related documents (i.e., Sales Agreement and Promissory Note) "have been negotiated, executed and delivered in the Commonwealth of Virginia." *See* Exhibit D.  It is immaterial that the Business is located in the District of Columbia.

4.    It is no less inconvenient for Plaintiff to litigate in Norfolk than it is for Defendants to litigate in the District of Columbia.

5.    The most critical factor to examine in considering a motion to transfer venue under 28 U.S.C. § 1404(a) is the convenience of witnesses. *Chung v. Chrysler Corp.*, 903

F. Supp. 160, 164 (D.D.C. 1995).  Convenience of witnesses is served by transfer.  The following individuals will likely be called as witnesses in the case:

        a.    Stewart B. Pruitt

Mr. Pruitt resides in Nassawadox, Virginia.  He has knowledge regarding all aspects of the matters set forth in the Complaint.

        b.    Robert Young, CPA

Mr. Young is Pruitt's Seafood's accountant.  His offices are located in Accomac, Virginia.  He has possession of Pruitt's Seafood's financial records related to the sale of the Business and Mr. Pruitt's tax records and would testify concerning such matters.

        c.    Robey Hackney

Mr. Hackney works and lives in Norfolk, Virginia.  Mr. Hackney represented Pruitt's Seafood in negotiations with Plaintiff regarding the sale of the Business.  Mr. Hackney may testify to matters outside of the attorney-client privilege and/or work product doctrine.

        d.    Sang K. Park

Mr. Park works in Annandale, Virginia.  Mr. Park represented Plaintiff in negotiations with Pruitt's Seafood regarding the sale of the Business.

        e.    Custodian of Records, O'Brier Seafood

O'Brier Seafood is the vendor currently owed substantially more money by Plaintiff than any other vendor.  O'Brier Seafood is located in Callao, Virginia.

        f.    Custodian of Records, PK Seafood

PK Seafood is one of the vendors currently owed monies by Plaintiff.  PK Seafood is located in Colonial Beach, Virginia.

The remaining vendors currently owed monies by Plaintiff are identified in Exhibit A. None of these vendors is located in the District of Columbia.

      6.     Ease of access to sources of proof weighs at least somewhat in favor transfer of the case to the Eastern District. All of Pruitt Seafood's records with regard to the transaction at issue are located in Accomac, Virginia, at its accountant's offices. Moreover, all of Mr. Pruitt's financial records, to the extent they are admissible, are located in Accomac, Virginia at his accountant's offices.

      C.     Public Factors Under 28 USC § 1404(a)

      1.     The Sales Agreement, Promissory Note, and Security Agreement provide that Virginia law applies. The transferee court is more familiar with Virginia common law regarding fraud, fraudulent inducement, failure of consideration, breach of contract, and available remedies for each such cause of action.

      2.     As to the relative congestion of the calendars of the potential transferee and transferor courts, a Judicial Caseload Profile provided by the Administrative Office of the U.S. Courts Statistical Division shows that for the twelve month period ending September 30, 2004, the Eastern District of Virginia was ranked number three of all U.S. Courts in the median time taken to resolve a civil dispute from filing to disposition and was ranked number one in the median time taken to resolve a civil action from the date of filing to trial. On the other hand, the District of Columbia is ranked fifty-nine with respect to the median time for resolving civil matters from the filing to disposition and sixty-five with respect to the median time for resolving civil actions that go to trial. Another telling statistic relates to the number and percentage of pending civil cases over three years old. In this category, the Eastern District of Virginia ranks

fourth in the country and the District of Columbia ranks eighty-seventh for the year ending June 30, 2001. A copy of the Judicial Caseload Profile is attached as Exhibit G.

      3.    A Virginia court has a superior interest to a District of Columbia court in deciding this type of controversy where its own law applies and the cause of action arose in Virginia.

### Conclusion

A fair weighing of the considerations applicable to a motion to transfer, coupled with the forum-selection clauses in the Promissory Note and Security Agreement, strongly support transfer. For the foregoing reasons, Defendants respectfully request that this Court grant their Motion to Transfer.

**PRUITT'S SEAFOOD, INC.**
**STEWART B. PRUITT**


By: _____
                **Of Counsel**

Karen A. Doner (D.C. Bar No. 458626)
WILLIAMS MULLEN
8270 Greensboro Drive, Suite 700
McLean, VA 22102
(703) 760-5200
(703) 748-0244 (Fax)

William F. Devine (Va. Bar No. 26632)
David A. Greer (Va. Bar No. 24128)
Kendra J. Jarrell (Va. Bar No. 65583)
WILLIAMS MULLEN HOFHEIMER NUSBAUM
1700 Dominion Tower
Post Office Box 3460
Norfolk, Virginia 23514-3460
(757) 622-3366
(757) 629-0700 (Fax)

**Certificate Of Service**

I HEREBY CERTIFY that on this 4th day of November, 2005, a copy of the foregoing

document was sent via first-class mail postage prepaid, to:

        Simon M. Osnos, Esq.
        7700 Leesburg Pike, #434
        Falls Church, VA  22043
        Counsel for Plaintiff

                                Karen A. Doner

1208498v2

## SALES AGREEMENT

THIS AGREEMENT, made and entered into this 28th day of April 2004, by and between PRUITT SEAFOOD, INC., a Virginia corporation, hereinafter referred to as "Seller," and DNM SEAFOOD, INC., hereinafter referred to as "Purchaser."

WITNESETH:

WHEREAS, the Seller is the sole and rightful owner of that certain business known as "Pruitt's Seafood," hereinafter referred to as the "Business," located at 1100 Main Avenue, S.W., Washington, D.C. 20024, hereinafter sometimes referred to as "Premises"; and,

WHEREAS, the Seller desires to sell to Purchaser, and Purchaser to purchase from Seller, certain assets of the Seller.

NOW, THEREFORE, for and in consideration of the mutual premises and covenants set forth herein and other valuable consideration, the parties hereto do agree as follows:

1.    **Sale of Business.**  The Seller shall sell, convey, and transfer to the Purchasers, free and clear of all liabilities, obligations, and encumbrances, the assets of the Business owned and operated by the Seller at the Premises, including, but not limited to, the trade name and goodwill of the business as a going concern, transferable licenses, the equipment, furniture, fixtures, including all the inventory, and all other tangible and intangible property rights, used and enjoyed by the Seller in connection with the Business (the "Assets"), except for cash on hand or in bank accounts, accounts receivable, security deposit with the landlord and those assets listed on <u>Exhibit A</u> hereto.

2.    **Purchase Price.**  The total purchase price that the Purchaser shall pay to the Seller shall be the sum of THREE MILLION DOLLARS ($3,000,000.00), which shall be paid as follows:

a)    the sum of Fifty Thousand Dollars ($50,000.00) as earnest money deposit (the "Deposit") to be held in escrow by Purchaser's attorney, Moon, Park & Associates, until disbursed in accordance with the terms of this Agreement;

b)    the sum of Six Hundred Fifty Thousand Dollars ($650,000.00) in cash or certified funds at the settlement, of which the aforesaid deposit shall be a part;

c)    the sum of One Hundred Fifty Thousand Dollars ($150,000.00) by executing a promissory note ("Note I") in the same amount with no interest at the settlement. Said note shall be paid in one lump sum on or before July 31, 2004;

d)    the sum of Two Million Two Hundred Thousand Dollars ($2,200,000.00) by executing a promissory note ("Note II") in the same amount with annual interest of four and 2 tenths percent (4.2%). Said note shall be fully amortized for a term of seventeen and one-half (17.5) years and be paid by consecutive monthly installments of Fourteen Thousand Eight Hundred Eleven and 15/100 Dollars ($14,811.15) with such first installment due in thirty (30)



days from the settlement date (hereinafter defined). Any installment not made within seven (7) days after being due shall incur five percent (5%) late charge. Seller may accelerate the remaining balance of the note together with accrued and unpaid interests forty (40) days after having sent Purchaser notice of any default under the respective Note I or Note II with a fifteen (15) day cure period once the Purchaser defaults under the note. The Notes I and II shall be guaranteed personally by Purchaser and Young Wha Kim and secured by a security agreement.

     e)    in addition, the following seafood inventory shall be counted at a wholesale or invoice price whichever is lesser and be paid in cash or certified funds at settlement: unopened boxes in cooler or freezer and live crabs. Any and all other inventories (for illustration purpose only, seafood displayed on 120-feet display stand, opened boxes in or out of cooler or freezer, dead crabs, etc.) shall be included in the total purchase price of Three Million Dollars.

    **3.**    **Adjustments.** The parties hereto shall make necessary and proper adjustments at the time of settlement for the items including, but not limited to, rent, utilities, and taxes.

    **4.**    **Bulk Sale.** The parties hereto duly acknowledge that the sale and purchase of the Business contemplated hereunder may be subject to District of Columbia Bulk Sales Act, under which the creditors of the Business should be given a prior written notice of the settlement. The Seller shall give the Purchaser a list of the Seller's creditors for the Business within seven (7) days after execution of this Agreement. In lieu of Bulk Sales Affidavit, the Seller may execute an Affidavit of No Creditor at the time of the settlement.

    **5.**    **Representations and Warranties of Seller.** The Seller warrants, represents, and agrees as follows:

    a)    At settlement, it shall have good and marketable title to and own outright all properties and assets to be transferred hereunder.

    b)    It has complied with all applicable laws, ordinances, regulations, and orders which have material impact on its business and properties and holds licenses and permits from appropriate governmental authorities necessary for the conduct of its business. Seller agrees to pay for all reasonable expenses the Purchaser incurred in the event that any fee is required for the transfer of the licenses and/or permits required for the operation of the Business by Purchaser; provided, however, that such fees and expenses shall not exceed Five Hundred Dollars ($500.00).

    c)    All material tax returns for federal, state and local income, withholding, retail sales, personal property, excise, and franchise taxes required by law to be filed by the Seller, prior to the date of this Agreement, have been filed, or shall be filed forthwith, and all such taxes as may accrue through the settlement date shall be paid by the Seller on a timely basis, or will be timely satisfied from Seller's cash proceeds at the settlement.

    d)    All certificates, licenses, and permits which are required for the lawful use and occupancy of the premises and structures used by the Seller have been obtained and are and on the settlement date, will be in full force and effect; excluding assignment for lease of the Premises.

6.    **Covenants of Seller.** The Seller covenants with the Purchaser as follows:

a)    The Bill of Sale, Affidavit of No Creditor, and instruments of assignment to be delivered at the settlement will transfer all of the Assets free and clear of all encumbrances, and will contain the usual warranties and affidavit of title. The equipment, furniture and fixture conveyed shall be in good working order, reasonable wear and tear excepted, on the settlement date and the Seller agrees to make all necessary repairs to the equipment, furniture and fixture in the event it is found at the time of settlement to be not in working order. Purchaser shall be allowed to inspect the equipment, furniture and fixture the day before the settlement at its own costs and expenses.

b)    The Seller, up to the date of settlement, shall operate and maintain its business in its regular course; it will not violate the terms of the lease of the Premises or other contracts necessary or desirable in and to the continued operation of the Business in the regular course and without interruption; and it shall conduct its business, up to the date of settlement, in accordance with all governmental laws, rules, and regulations.

c)    That all of its creditors (including taxing authorities) relating to its ownership and operation of the Business shall be satisfied at the time of settlement or shall be promptly paid from the proceeds received by the Seller at settlement. The parties shall cooperate fully with one another to facilitate the prompt payment, or compromise and settlement of all such claims.

7.    **Settlement.** The settlement of this purchase and sale shall take place on or before May 3, 2004 at the law offices of Moon, Park & Associates, 7617 Little River Turnpike, #930, Annandale, VA. 22003.

8.    **Indemnification.**

a)    Seller agrees to indemnify and hold harmless the Purchaser from and against any loss, cost, damage, liability, or expense, in excess of One Thousand Dollars ($1,000.00), including reasonable attorney's fees, arising in any manner upon a breach of warranty or no-fulfillment of any covenant or agreement on the part of the Seller under this Agreement, and arising out of operation of the Business prior to the settlement. In no event shall Sellers indemnification liability exceed the amount paid under the Purchase Price.

b)    Purchaser agree to indemnify and hold harmless the Seller from and against any lost, cost, damage, liability, or expense, in excess of One Thousand Dollars ($1,000.00), including reasonable attorney's fees, arising in any manner upon a breach of warranty or non-fulfillment of any covenant or agreement on the part of the Purchaser under this Agreement, and arising out of operation of the Business on and after the settlement.

9.    **Contingencies.** This Agreement is subject to the following contingencies, non-satisfaction of any or all of which on or before the settlement date shall entitle either party to hold this Agreement null and void in its entirety:

a)    The parties obtaining assignment of the existing lease agreement for the Premises from District of Columbia Government; and,

b)    Purchaser and Purchaser's attorney being satisfied with the terms and conditions of the existing lease agreement for the Premises. Purchaser and Purchaser's attorney shall be given ten (10) days immediately following ratification of this Agreement to review the lease agreement.

In the event that either party holds this Agreement null and void in its entirety due to non-satisfaction of any of the aforesaid contingencies, Purchaser shall be entitled to receive any and all monies paid hereunder forthwith. In the event that Purchaser holds this Agreement null and void for any reason other than the aforesaid contingencies, Seller shall be entitled to receive the Deposit.

**10.    Risk of Loss.** The Seller shall assume all risk of loss due to fire or other casualty up to and including the date of settlement.

**11.    Training.** The Seller, by himself and through a managerial employee, agrees to train Purchaser for two (2) weeks immediately after the settlement during all normal hours of Business, at its own costs and expenses, so that Purchasers may be familiarized with the operation of Business.

**12.    Non-Competition.** The Seller agrees to, and shall cause its stockholders, officer and directors to, execute a non-competition covenant at the settlement, covenanting not to engage in the same or substantially similar type of business, as owner (legal or beneficial), partner, shareholder, employee, or otherwise, directly or indirectly, within the area of Ten (10) city blocs from Premises for a period of Five (5) years. Notwithstanding anything contrary herein, Seller or Seller's stockholders or directors are allowed to engage in a wholesale seafood business.

**13.    Survival of Representations, Warranties, and Agreements.** The representations, warranties, indemnities, and agreements set forth and/or made pursuant to this Agreement shall remain operative and shall survive the settlement under this Agreement for three (3) months.

**14.    Entire Agreement.** This Agreement represents the entire agreement of the parties relating to the purchase and sale of the Business. All prior negotiations and agreements between the parties are merged in this Agreement and there are no understandings or agreements other than those incorporated herein. This Agreement may not be modified or altered, except by an instrument in writing duly executed by the parties hereto.

**15.    Binding Effect.** This Agreement shall be binding upon this signatories hereto, their heirs, personal representatives, successors, and assigns. This Agreement shall be governed by the laws of the Commonwealth of Virginia.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the day and year first above written.

SELLER:                                           PURCHASER:

**PRUITT SEAFOOD, INC.**                          **DNM SEAFOOD, INC.**
a Virginia corporation

By:  President, Steward B. Pruitt                 By: Sung Jin Kim

By: Vice President, Naomi R. Pruitt

By: Secretary, Jeffrey K. Pruitt

#440195 v2 - Sales Agreement - Pruitt's Seafood

## EXHIBIT A
## EXCLUDED ASSETS

1. 1995 Mach 6-Wheel Truck
2. 1997 International 6-Wheel Truck
3. 1997 International 6-Wheel Truck
4. 1998 International 6-Wheel Truck
5. 2000 Ford F-350 Pickup
6. 2003 Ford F-350 Pickup
7. Honda Pressure Washer
8. Generic Generator
9. Tools and Tool Boxes

## EXHIBIT B
## ADDITIONAL TRANSFERRED ASSETS TO BUYER

2003 Ford F-350 Pickup without refrigeration unit.

2000 Ford F-350 15 passenger van

One sheet 3/16th inch thick steel deck plate

Two ceiling fans for cook boat

# PROMISSORY NOTE



$ 2,200,00.00

Annandale, Virginia
May 3, 2004

FOR VALUE RECEIVED, DNM Seafood, Inc., a District of Columbia corporation, Sung Jin Kim, and Yong Wha Kim (collectively, "**Maker**"), promises to pay, joint and severally, to the order of Pruitt's Seafood, Inc. ("**Noteholder**") at the address of P.O. Box 75, Harborton, Virginia 23389, or at such other address as the Noteholder may designate in writing, the principal sum of Two Million Two Hundred Thousand Dollars ($2,200,000.00), together with interest and pursuant to the terms set forth in this promissory note ("**Note**").

Interest. Interest shall accrue on the unpaid balance of this Note from the date hereof until paid in full at four and two tenths percent (4.2%) per annum. If all sums due pursuant to this Note are not paid when due, then following such due date, whether at maturity, by acceleration or otherwise, the interest rate will increase and will accrue on the total of the unpaid principal balance, accrued and unpaid interest and late charges until all such sums are paid in full at ten percent (10%) per annum without prejudice to any of the other rights or remedies of Noteholder.

Repayment. The sums owed on this Note shall be paid in equal monthly installments of principal and interest of $14,811.15 ("**Installment Payments**"), beginning on May 30, 2004 and continuing on the 30th day of each month thereafter until all such sums are paid in full.

Maturity. If not sooner paid, the entire balance, all accrued and unpaid interest and all other sums owed under this Note shall be due and payable in full on or before October 30, 2021 ("**Maturity Date**").

Late Charges. Maker shall pay to Noteholder, on demand, a "late charge" equal to five percent (5%) of any payment of principal and/or interest which is not paid within ten (10) days after its due date.

Application of Payments. All payments shall be applied first to the payment of any costs or expenses of the Noteholder due hereunder, then any late charge due hereunder, then to interest due and any balance shall be applied in reduction of principal.

Prepayment. This Note may be prepaid in whole or in part at any time, or times, without penalty or premium and without the prior written consent of Noteholder.

**IMPORTANT NOTICE: THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.**

Legal Tender. All payments hereunder shall be payable in lawful money of the United



EXHIBIT
C

*which shall not occur until a fifteen (15) days subsequent to Noteholder sending a notice to cure to Maker,* 〜M 5B.

States which shall be legal tender for public and private debts at the time of payment.

**Security Agreement.** This Note is secured by the terms of a Security Agreement of even date herewith ("**Security Agreement**") made by Maker, as debtor, to Noteholder, as secured party, granting to Noteholder a security interest in all assets of DNM Seafood, Inc. The provisions of the Security Agreement are incorporated into this Note by reference and made a part of this Note.

**Default.** Upon the occurrence of an Event of Default, the entire unpaid principal balance of this Note together with accrued interest thereon and all other sums due the Noteholder hereunder shall, at the option of the Noteholder, at once become due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby waived by the Maker, and, in addition, Noteholder shall have all other remedies under applicable law or as set forth in the Security Agreement.

The happening of any one of the following events shall constitute an Event of Default: (1) failure to make within forty (40) days of when due any installment or other payment described herein, whether of principal, interest, late charges or otherwise; (2) the inability of the Maker, or any of them, to pay debts as they become due, or the insolvency of the Maker, or any of them, or the application for the appointment of a receiver or custodian for the Maker, or any of them, or the property of the Maker, or any of them, or the entry of an order for the relief or the filing of a petition by or against the Maker, or any of them, under the provisions of any bankruptcy or insolvency law, or any assignment for the benefit of creditors by or against the Maker, or any of them, (provided, however, that the filing of an involuntary petition in bankruptcy against the Maker, or any of them, shall not constitute an event of default unless it has not been dismissed within forty-five (45) days of its filing); (3) the entry of a judgment against the Maker, or any of them, or the issuance or service of any attachment, levy or garnishment against the Maker, or any of them, or the property of the Maker, or any of them; (4) a default in the performance or observance of any covenant, agreement or other term or provision of the Security Agreement, the Sales Agreement or this Note; or (5) if any representation, warranty, or other statement of fact made or delivered by any party, whether orally or in writing, to the Noteholder in connection with the administration of this Note shall prove to have been false, misleading or incomplete in any material respect at the time when such warranty, representation or statement was made or furnished to the Noteholder.

**Attorney's Fees and Costs of Collection.** The Maker and any other party liable under this Note shall also be obligated to pay, as part of such indebtedness, all costs of collection that may be incurred by the Noteholder in the collection and enforcement of this Note, including without limitation reasonable attorney's fees and all court costs and other litigation expenses, only in the Event of Default.

**Waivers.** Each person liable on this Note in any capacity, whether as the Maker, co-maker, endorser, surety and guarantor hereof (collectively, "**Party**") jointly and severally (i) waive presentment, demand, protest and notice of dishonor and any and all lack of diligence or delays in collection or enforcement hereof, (ii) waive all exemptions, whether homestead or otherwise, as to the obligation evidenced by this Note, (iii) waive any right which they may have to require Noteholder to proceed against any other party or foreclose on any collateral given to secure the payment of this Note, (iv) agree that, without notice to any party and without affecting any such

party's liability, Noteholder, at any time or times, may grant extensions of the time for any payment due on this Note, release any such party from its obligations to make payments on this Note, permit the renewal of this Note, or permit the substitution, exchange or release of any security of this Note, (v) waive all rights afforded to them under Sections 8.3A-605, 49-25 and 49-26 of the Code of Virginia of 1950, as amended, and (vi) to the extent not prohibited by law, waive the benefit of any defense, credit, entitlement, counterclaim, law, rule of law, advantage or protection as an obligor hereunder or providing for his or her release or discharge from liability hereon, in whole or in part, on account of any facts or circumstances other than full and complete payment of all amounts due under this Note, including, but not limited to, any laws or regulations relating to (a) usury, (b) any implied duty of good faith or fair dealing under the Uniform Commercial Code or otherwise, (c) the compromise of any claim against or release of any Party or any security, (d) the disability of any Party liable on this Note, (e) any right of subrogation, any right to enforce or claim the benefit of any right or remedy of the holder of this Note against any Party or security, and any right as a third party beneficiary of any obligation or duty owed to the holder of this Note, (f) any prior, contemporaneous or subsequent oral representations or oral modifications made by any agent of the holder of this Note to any Party, (g) any claim of duress or undue influence, or (h) any statute giving any Party the right to require (or providing for his or her discharge in the absence of) the institution of any suit on this Note.

Time is of the Essence.  Time is of the essence with regard to the payment of any amounts due under this Note and the performance of the covenants, terms and conditions of this Note.

Severability.  In the event any covenant, term or condition of this Note shall be held for any reason to be invalid, illegal, or unenforceable in any respect, the invalidity, illegality or unenforceability of such covenant, term or condition shall not affect the validity, legality or enforceability of the remaining covenants, terms and conditions of this Note.

Successor and Assigns.  The covenants, terms and conditions of this Note shall be binding upon the heirs, personal representatives, successors and assigns of each Maker and shall inure to the benefit of the Noteholder, its successors and assigns.

Waiver of Right to Jury Trial.  TO THE FULLEST EXTENT POSSIBLE, MAKER WAIVES IN FULL THE RIGHT TO A TRIAL BY JURY IN REGARD TO ANY DISPUTES, CLAIMS, CAUSES OF ACTION, OBLIGATIONS, DAMAGES, COMPLAINTS, LITIGATION OR ANY MATTER WHATSOEVER AND OF ANY TYPE OR NATURE, WHETHER IN CONTRACT, TORT OR OTHERWISE, WHICH MAKER MAY HAVE NOW OR IN THE FUTURE MAY HAVE RELATING TO THIS NOTE OR ANY MATTER RELATING TO THE LOAN WHICH THIS NOTE EVIDENCES.  BY EXECUTION OF THIS NOTE, MAKER REPRESENTS AND WARRANTS THAT MAKER IS REPRESENTED BY COMPETENT COUNSEL WHO HAS FULLY AND COMPLETELY ADVISED MAKER OF THE MEANING AND RAMIFICATIONS OF THE RIGHT OF MAKER TO A TRIAL BY JURY OR HAD THE FULL AND COMPLETE OPPORTUNITY TO CONSULT SUCH COUNSEL AND CHOSE NOT TO DO SO, AND, THEREFORE, MAKER FREELY AND VOLUNTARILY WAIVES SUCH RIGHT TO TRIAL BY JURY.

3

Excessive Interest.  To the extent any late charges or rate of interest stated in this Note exceeds the late charge or maximum rate of interest which may be charged on obligations of the type and nature evidenced by this Note, then said late charges or rate of interest shall be abated and reduced to the extent necessary to conform with applicable law.

Governing Law.  This Note shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia. This Note is executed under seal.

Jurisdiction.  The Maker hereby submits to the jurisdiction and venue of the Circuit Court of the City of Virginia Beach and the United States District Court for the Eastern District of Virginia, Norfolk Division, and agrees that the Noteholder may, at its option, enforce its rights under the Note in such courts.

Failure to Exercise Rights.  Any failure by the Noteholder to exercise any right hereunder shall not be construed as a waiver of the right to exercise the same or any other rights at any time.

Notices.  All notices required or permitted under this Note shall be given in writing to Maker at the address set forth beside Maker's signature and to Noteholder at the address set forth above.

**Confession of Judgment**.  The Maker and any endorsers hereof hereby each appoint Stephen G. Test and Robert H. Burger as its (their) attorneys-in-fact, either of whom shall have the power to confess judgment against the Maker, or any of them, and/or any of the endorsers hereof in favor of the Noteholder in the Clerk's Office of the Circuit Court of the City of Virginia Beach, Virginia, or in any other court of proper jurisdiction for the unpaid balance of the Note, plus costs, expenses and attorney's fees as specified herein, upon the occurrence of an Event of Default.

IF MORE THAN ONE PERSON SIGNS THIS NOTE BELOW, EACH SUCH PERSON SHALL BE A CO-MAKER OF THIS NOTE AND SHALL BE JOINTLY AND SEVERALLY LIABLE UNDER THIS NOTE.

IN WITNESS WHEREOF, the Maker has duly signed and sealed this Note as of the date and year first above written.

Address for Notices:

9208 MaCswain Pl
Springfield VA
22153

MAKER: DNM Seafood, Inc.

By _____(SEAL)
Print Name: Sung J. Kim
Title: President

4

COMMONWEALTH OF VIRGINIA
AT LARGE

     The foregoing instrument was acknowledged before me this _3rd_ day of May, 2004, by Sung Jin Kim, who is personally know to me or produced valid identification, Director of DNM Seafood, Inc. a District of Columbia corporation, on behalf of the corporation.

     GIVEN under my hand this _3rd_ day of May, 2004.

_____
             Notary Public

My Commission Expires: _5/31/2006_

Address for Notices:
_9208 Macswain P l_
_Springfield VA_
_22153_

MAKER:

By _____(SEAL)
     SUNG JIN KIM


COMMONWEALTH OF VIRGINIA
AT LARGE

     The foregoing instrument was acknowledged before me in the City of _Fairfax_, Virginia, this _3rd_ day of May, 2004, by Sung Jin Kim, who is personally know to me or produced valid identification.

     GIVEN under my hand this _3rd_ day of May, 2004.

_____
             Notary Public

My Commission Expires: _5/31/2006_

Address for Notices:
_9208 Macswain P lace_
_Springfield VA_
_22153_

MAKER:

By _____(SEAL)
     YONG WHA KIM

5

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT ("Security Agreement") is made as of May 3, 2004, by and between DNM SEAFOOD, INC., a District of Columbia corporation ("DNM Seafood"), having a mailing address of 1100 Main Ave, S.W., Washington, D.C. 20004, SUNG JIN KIM ("Mr. Kim") and YONG WHA KIM ("Mrs. Kim"), husband and wife, having a mailing address of 1100 Main Ave, S.W., Washington, D.C. 20004 (DNM Seafood, Mr. Kim and Mrs. Kim shall be collectively, the "Debtor"), and PRUITT'S SEAFOOD, INC., a Virginia corporation, having a mailing address of P.O. Box 75, Harborton, Virginia 23389 (the "Secured Party").

## R E C I T A L S:

A.     Secured Party made two loans (collectively, the "Loan") to DNM Seafood evidenced by two notes from Maker to Secured Party, the first for the amount of ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000) dated May 3, 2004 ("Note I") and the second for the amount of TWO MILLION TWO HUNDRED THOUSAND DOLLARS ($2,200,000) dated May 3, 2004 ("Note II") (Note I and Note II shall be collectively known as the "Note").

B.     A condition precedent to the origination of the Loan is the execution, delivery and performance of this Security Agreement by Debtor.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, the Debtor and the Secured Party agree as follows:

1.     Definitions.  For all purposes of this Security Agreement, any financing statement filed in connection with this Security Agreement and any amendments or supplements to this Security Agreement (except as otherwise stated or unless the context otherwise requires), (a) all capitalized terms will have the meanings assigned to them in the recitals above, in this section and in other sections of this Security Agreement or the Note and include the plural, the singular and all genders, (b) UCC means the Uniform Commercial Code as adopted in the Commonwealth of Virginia in effect on the date of this Security Agreement or as it may be amended from time to time, (c) Governmental Authority means the United States of America, the Commonwealth of Virginia, any state in which all or any part of the Collateral is located and/or any political subdivision, city, county, court, agency, department, commission, bureau or instrumentality of any of them and (d) Lien means all mortgages, deeds of trusts, pledges, liens, security interests, assignments and other charges and encumbrances of any nature whatsoever.

2.     Security Interest.  To secure the payment, satisfaction and discharge of the Obligations described in **Section 3** below, the Debtor hereby assigns, transfers, pledges and sets over unto the Secured Party, and its successors and assigns, and grants the Secured Party, and its successors and assigns, a security interest in, all of the assets and personal property of every kind and nature of the Debtor, whether tangible or intangible, whether now existing or hereafter arising, whether now owned or hereafter acquired by the Debtor or in which the Debtor now has or hereafter acquires any right, title or interest, together with all of the cash and non-cash proceeds and products thereof and all additions, accessions and substitutions thereto and therefor (all of which



EXHIBIT
D

shall be collectively referred to as the "**Collateral**"), including, without limitation, the following:

(a) All of the Debtor's accounts, accounts receivable, health insurance receivables, contract rights, instruments, certificates of deposit, documents, chattel paper (including electronic chattel paper), notes, drafts, acceptances and other forms of obligations and receivables, whether or not earned by performance, and which are now owned or hereafter acquired by the Debtor or in which the Debtor now has or hereafter acquires any right, title or interest (hereinafter collectively referred to as "**Accounts Receivable Collateral**") together with all proceeds of the Accounts Receivable Collateral; and

(b) All of the Debtor's tangible personal property, goods, books, records, furniture, apparatus, furnishings, fittings, fixtures, machinery, motor vehicles, appliances, computer systems, and equipment, wherever located or however used, which are now owned or hereafter acquired by the Debtor or in which the Debtor now has or hereafter acquires any right, title or interest (hereinafter collectively referred to as "**Equipment Collateral**"), together with all proceeds of the Equipment Collateral; and

(c) All general intangibles of the Debtor, which are now owned or hereafter acquired by the Debtor or in which the Debtor now has or hereafter acquires any right, title or interest, including, without limitation, all payment intangibles, choses in action, things in action, suits, actions, causes of actions, commercial tort claims and claims of every kind and nature, whether at law or in equity and all condemnation awards, insurance proceeds, customer lists, trade secrets, servicing rights, computer software and technology (including, but not limited to, all embedded software, all source and object codes and all updates of any software technology), patents and patent rights (whether or not registered), patent applications, all trade secrets relating to the inventions protected by all patents disclosed to the United States Patent and Trademark Office or otherwise known by the inventors during the examination of such patents, all information and other materials necessary to fully exploit any technology, licenses, trademarks and trademark applications (whether or not registered), trade names, domain name registrations and web site designs, copyrights and copyright applications (whether or not registered), logos, engineering drawings, goodwill, all claims for income tax refunds and other payments from any local, state or federal governmental authority or agency, all licenses, permits and agreements of any kind or nature pursuant to which (i) Debtor operates or has authority to operate, (ii) Debtor possesses, uses or has authority to possess or use property (whether tangible or intangible) of others or (iii) others possess, use or have authority to possess or use property (whether tangible or intangible) of Debtor, and all recorded data of any kind or nature, regardless of the medium of recording, including, without limitation, all software, writings, plans, specifications, schematics and documents (hereinafter collectively referred to as "**Intangibles Collateral**") together with all proceeds of the Intangibles Collateral; and

(d) All demand, time, savings, passbook and other deposit accounts of the Debtor with all banks, credit unions, savings and loan associations and other financial institutions which are now owned or hereafter acquired by the Debtor or in which the Debtor now has or hereafter acquires any right, title or interest (hereinafter collectively referred to as "**Deposit Accounts Collateral**") and all of the Debtor's money together with all proceeds of the Deposit Accounts Collateral; and

2

(e) All of the Debtor's inventory and other tangible personal property, which are now owned or hereafter acquired by the Debtor or in which the Debtor now has or hereafter acquires any right, title or interest, and held for sale or lease or to be furnished under contracts or used or consumed in the Debtor's business (hereinafter collectively referred to as "**Inventory Collateral**") together with all contractual rights of the Debtor pertaining to the Inventory Collateral and all proceeds of the Inventory Collateral; and

(f) All of the Debtor's Investment Property as defined under the UCC, and all proceeds of the Investment Property; and

(g) All of the Debtor's Supporting Obligations as defined under the UCC, and all proceeds of the Supporting Obligations; and

(h) All of the Debtor's Letter-of-Credit Rights as defined under the UCC, and all proceeds of the Letter-of-Credit Rights; and

(i) All awards and other payments in respect of any governmental taking and all insurance proceeds and other proceeds in respect of any of the foregoing, together with all amounts received by the Secured Party, or expended by the Secured Party pursuant to this Security Agreement and all monies and claims for money due and to become due to Debtor under all its accounts, contract rights, leases and general intangibles as said terms are defined in the UCC.

Debtor acknowledges and agrees that, with respect to any term used in any UCC-1 financing statement or this Security Agreement that is defined in either (i) Article 9 of the UCC or (ii) Article 9 of the Uniform Commercial Code as in force at any relevant time in the jurisdiction in which any financing statement related to this Security Agreement is filed, the meaning to be ascribed to such term with respect to any particular item of property will be the meaning under the more encompassing of the two definitions. Debtor further acknowledges and agrees that this Security Agreement and any financing statement filed in connection with this Security Agreement is intended to cover and does cover all assets of the Debtor, wherever located, whether now owned or subsequently acquired or arising and all proceeds and products of such assets.

3.      Secured Indebtedness. This Security Agreement and the security interest and rights of the Secured Party in the Collateral shall secure the payment and discharge of all indebtedness, obligations and liabilities of the Debtor to the Secured Party, whether now existing or hereafter incurred, whether matured or unmatured, whether direct or indirect, whether absolute or contingent, whether liquidated or unliquidated, whether secured or unsecured, whether original, renewed or extended, whether contracted by any such party alone or jointly and/or severally with another or others, whether originally contracted with the Secured Party or acquired by the Secured Party by negotiation, assignment, transfer or otherwise from another or others, and whether or not represented by notes, instruments or other writings (hereinafter all of the foregoing shall be collectively referred to as the "**Obligations**"), including, without limitation, the following:

(a)      The Note;

3

(b)      Any and all additional sums which may hereafter be advanced to or for the Debtor by the Secured Party for any purpose whatsoever with interest thereon at an annual rate equal to the prevailing interest rate under the Note in effect from time to time (unless the payment of interest has been otherwise provided for in any instrument or document evidencing or relating to such advance of funds) whether evidenced by notes, drafts, open account, or otherwise, including, without limitation, any expenditures under the Obligations and the Security Instruments, as hereinafter defined, and any overdrafts which the Secured Party may permit the Debtor to make (the making of any such advances, expenditures or overdrafts is not obligatory and is in the absolute discretion of the Secured Party) and also the payment and performance of any and all other present and future liabilities, obligations and indebtedness of the Debtor to the Secured Party;

(c)      All costs, expenses, charges, liabilities, commissions, half-commissions and attorneys' fees now or hereafter chargeable to, or incurred by, or disbursed by, the Secured Party pursuant to this Security Agreement, applicable law, the Note, any of the other Obligations, or any other documents which set forth the agreements, understandings and covenants between the Debtor and the Secured Party and/or which set forth the representations and warranties made by the Debtor to the Secured Party (hereinafter all of which shall be collectively referred to as the "**Security Instruments**");

(d)      The performance of, observance of and compliance with all of the terms, covenants, conditions, stipulations and agreements contained in any and all instruments, agreements and documents, which the Debtor or any other person or entity, has executed and delivered, or may hereafter execute and deliver, in connection with the Note and the other Obligations including, without limitation, this Security Agreement and the Security Instruments; and

(e)      All renewed, extended, modified and/or curtailed Obligations (unlimited renewal, curtailment or extension of all or any part of the Obligations being expressly permitted), whether or not by note or other instrument, together with all interest and charges incurring therein, whether before or after maturity.

4.      Perfection; Care of Collateral.

(a)      Financing Statements.  Debtor authorizes Secured Party to file UCC-1 financing statements, and ratifies the filing of any financing statements previously filed, covering the Collateral and all personal property of Debtor and containing such legends as Secured Party shall deem necessary or desirable to perfect Secured Party's Lien in and on the Collateral. Debtor agrees to pay all taxes, fees and costs (including attorneys' fees) paid or incurred by Secured Party in connection with the preparation, filing or recordation thereof. Debtor further authorizes Secured Party to file one or more financing statements describing any statutory liens held by Secured Party.

(b)      Possession.  Debtor will have possession of the Collateral except where expressly otherwise provided in this Security Agreement or where Secured Party chooses in its sole discretion to perfect its security interest by possession in addition to the filing of financing statements. Where Collateral is in the possession of a third party, Debtor will join with Secured Party in notifying the third party of Secured Party's security interest and obtaining an

4

acknowledgement from the third party that it is holding the Collateral for the benefit of Secured Party.

(c)    Control.  Debtor shall cooperate with Secured Party to obtain and keep in effect one or more control agreements to perfect a first priority Lien in Deposit Account Collateral and in Collateral constituting electronic chattel paper, Investment Property or Letter-of-Credit Rights.

(d)    No Debtor Filings.  Debtor will not file any amendments, assignments, correction statements or termination statements concerning the Collateral without the prior written consent of Secured Party.

(e)    Care of Collateral.  Debtor shall have all risk of loss of the Collateral. Secured Party shall have no liability or duty, either before or after the occurrence of an Event of Default, on account of loss of or damage to, or to collect or enforce any of its rights against, the Collateral, to collect any income accruing on the Collateral, or to preserve rights against account debtors or other parties with prior interests in the Collateral.  Debtor is responsible for responding to notices concerning the Collateral, voting the Collateral, and exercising rights and options, calls and conversions of the Collateral.  Secured Party's sole responsibility is to take such action as is reasonably requested by Debtor in writing; however, Secured Party is not responsible to take any action that, in Secured Party's sole judgment, would affect the value of the Collateral as security for the Obligations adversely.  While Secured Party is not required to take certain actions, if action is needed, in Secured Party's sole discretion, to preserve and maintain the Collateral, Debtor authorizes Secured Party to take such actions, but Secured Party is not obligated to do so.  All actions taken in good faith by the Secured Party and its officers, employees or agents, shall be binding on the Debtor, and the Debtor agrees to indemnify and hold the Secured Party and its officers, employees and agents harmless from any loss, damage and expense whatsoever in connection therewith. Such care as the Secured Party gives to the safekeeping of its own property of like kind shall constitute reasonable care of the Collateral when in the Secured Party's possession; but the Secured Party is not required to make presentment, demand or protest, or give notice, and need not take action to preserve any rights against prior or other parties in connection with any obligation or evidence of indebtedness held as Collateral or in connection with the Obligations. Debtor shall not document any vessel with any Government Authority without the prior written consent of the Secured Party.

5.    Covenants, Agreements, Representations And Warranties By The Debtor. The Debtor covenants, agrees, represents and warrants unto the Secured Party as follows:

(a)    The Debtor is and will be the absolute owner of the Collateral free and clear of any adverse lien, security interest or encumbrance other than the security interests granted to the Secured Party.  The Debtor agrees to defend the Collateral against all claims and demands of all persons and entities at any time claiming any right, title or interest of any kind or nature in all or any part of the Collateral adverse to the right, title and interest of the Debtor and/or the Secured Party in the Collateral.

5

(b)     The exact legal name of each Debtor is DNM Seafood, Inc., Sung Jin Kim and Yong Wha Kim. DNM Seafood is organized as a corporation in good standing under the laws of the District of Columbia. DNM Seafood's federal tax identification number is _____. DNM Seafood uses only the following trade name in the conduct of its business: DNM Seafood. DNM Seafood's chief executive office is located at 1100 Main Ave, S.W., Washington, D.C. 20004.

(c)     The execution, delivery and performance by the Debtor of this Security Agreement is within the Debtor's powers, has been duly authorized, and is not in contravention of any applicable law, any organizational documents of the Debtor or any indenture, agreement, or undertaking to which the Debtor is a party or by which the Debtor is bound.

(d)     The Debtor will immediately notify the Secured Party of any event causing material loss or depreciation in the value of the Collateral and the amount of such loss or depreciation. The Debtor will maintain the Collateral in good condition and repair, reasonable wear and tear excepted.

(e)     DNM Seafood will keep records concerning the Collateral at the principal office of 1100 Main Ave, S.W., Washington, D.C. 20004., and will keep the Secured Party advised of the location of such records. The Debtor will, at all reasonable times and from time to time, allow the Secured Party and its officers, agents, employees, attorneys and accountants to examine and inspect the Collateral and to examine, inspect, and make extracts from the Debtor's books and other records, and to arrange for verification of Accounts Receivable Collateral, if any, under reasonable procedures directly with the account debtors or by other methods.

(f)     The Debtor represents and warrants that except for the financing statements filed for the benefit of the Secured Party, no financing statement covering the Collateral or any proceeds thereof is on file in any public office.

(g)     The Debtor shall pay all taxes, levies, assessments and other charges of every kind or nature which may be levied or assessed against the Collateral.

(h)     The Debtor shall not permit or allow any adverse Lien (other than the security interest given to the Secured Party) to attach to the Collateral and shall not permit all or any part of the Collateral to be attached, levied on, garnished or made the subject of litigation and not dismissed within fifteen (15) days thereafter.

(i)     If the Debtor shall fail to pay any tax, levy, assessment or other charge against the Collateral, the Secured Party may, at its option, pay such tax, levy, assessment or other charge. The Debtor agrees to reimburse the Secured Party on demand for any such payment by the Secured Party. The amount of any such payment shall be an additional Obligation secured by this Security Agreement and shall be part of the "Obligations" as that term is used herein.

(j)     In the event that the Note or any of the Obligations or Security Instruments is referred to attorneys for enforcement or collection, the Debtor will pay the reasonable attorneys' fees of the Secured Party and any and all costs and expenses incurred by the Secured Party in

6

recovering possession of the Collateral, in enforcing this Security Agreement or any other of the Security Instruments and/or in enforcing or collecting the Note or any of the Obligations, the payment of all of which shall be secured by this Security Agreement and shall be part of the "Obligations" as that term is used herein.

(k)     The Debtor will not use the Collateral in violation of any applicable laws, statutes, regulations or ordinances.

(l)     The amounts of any funds which the Secured Party shall pay or expend for any purpose whatsoever under this Security Agreement shall be paid by the Debtor to the Secured Party on demand and shall bear interest thereon from the date of expenditure through the date of payment at an annual rate equal to the prevailing interest rate under the Note in effect from time to time.  All of such funds so paid or expended and all interest thereon shall be secured by this Security Agreement and shall be "Obligations" as that term is used herein.

(m)     Debtor will obtain and maintain insurance on the Collateral at Debtor's expense for the benefit of Secured Party with an insurance company acceptable to Secured Party against loss or damage by fire, theft and such other risk as Secured Party may designate and in such amounts as are satisfactory to Secured Party, with a loss payable clause in favor of Secured Party as its interest may appear.  The Debtor will on demand deliver the policies of insurance to Secured Party or furnish other proof of such insurance satisfactory to Secured Party.  Debtor assigns to Secured Party all rights to receive proceeds of any insurance on the Collateral, directs any insurer of the Collateral to pay all proceeds of insurance directly to Secured Party, and authorizes Secured Party to endorse any check, draft or other instrument for such proceeds and to apply such proceeds against such of the Obligations, whether or not then due and payable, as Secured Party, in its discretion, deems appropriate.  If Debtor fails or refuses to obtain and maintain the insurance required by this section, Secured Party may, at its option, purchase insurance on the Collateral.  The premiums and other costs of any such insurance which may be paid by Secured Party shall be "Obligations" secured by this Security Agreement.  Each of the then current officers of Secured Party is hereby appointed as Debtor's attorney-in-fact under a power coupled with an interest to endorse any draft, check or other instrument which may be payable to Debtor to collect returned or unearned premiums or the proceeds of such insurance.

(n)     If a petition for relief under any chapter of the Bankruptcy Code is filed by or against the Debtor, Debtor shall not seek a supplemental stay pursuant to Bankruptcy Code §§ 105 or 362 or any other relief pursuant to Bankruptcy Code § 105 or any other provision of the Bankruptcy Code, whether injunctive or otherwise, which would stay, interdict, condition, reduce or inhibit the Secured Party's ability to enforce any rights it has, at law or in equity, to collect the Obligations from any person (including, without limitation, any guarantor) other than the Debtor.

6.     Events Of Default.  The happening of any one of the following events shall constitute an Event of Default:  (1) failure to pay when due any installment or other payment described in the Note, whether of principal, interest, late charges or otherwise; (2) the inability of the Debtor to pay debts as they become due, or the insolvency of the Debtor, or the application for the appointment of a receiver or custodian for the Debtor or the property of the Debtor, or the entry of an order for the relief or the filing of a petition by or against the Debtor under the provisions of

7

any bankruptcy or insolvency law, or any assignment for the benefit of creditors by or against the Debtor (provided, however, that the filing of an involuntary petition in bankruptcy against the Debtor shall not constitute an event of default unless it has not been dismissed within forty-five (45) days of its filing); (3) the entry of a judgment against the Debtor or the issuance or service of any attachment, levy or garnishment against the Debtor or the property of the Debtor; (4) a default in the performance or observance of any covenant, agreement or other term or provision of the Note or this Security Agreement; or (5) if any representation, warranty or other statement of fact contained in this Security Agreement, or any of the Obligations made or delivered by any party, whether orally or in writing, to the Secured Party in connection with the administration of the Note, any of the Obligations or any of the Security Instruments shall prove to have been false, misleading or incomplete in any material respect at the time when such warranty, representation or statement was made or furnished to the Secured Party.

       7.   <u>Rights Of Secured Party On Default</u>.  On the occurrence of an Event of Default, the Secured Party shall have all of the rights and remedies of a secured party under the UCC regardless of the jurisdiction in which all or any portion of the Collateral may be located and may, but is not obligated to:

      (a)   Notify any obligor or account debtor on any of the Collateral to make payment to the Secured Party;

      (b)   Collect by legal proceedings or otherwise any of the Accounts Receivable Collateral and endorse, receive and receipt for all dividends, interest, payments, proceeds and other sums and property now or hereafter payable on or on account of the Collateral;

      (c)   Enter into any compromise, settlement, extension or other agreement pertaining to the Collateral or deposit, surrender, accept, hold or apply other property in exchange for the Collateral, or extend the time for or modify the terms and conditions governing the drawing, presentation, negotiation or acceptance of drafts or other instruments;

      (d)   Insure, process or preserve the Collateral;

      (e)   Take immediate possession of the Collateral and transfer Collateral to the Secured Party's own name or its nominee's name;

      (f)   Exercise all the rights, powers, and remedies of an owner with respect to the Collateral;

      (g)   Make any payment and/or perform any agreement undertaken by the Debtor and/or expend such sums and/or incur such expenses (including, without limitation, attorneys' fees) as the Secured Party, in its sole discretion, shall deem advisable;

      (h)   Enter on the premises where the Collateral is located to take possession or control of the Collateral, and the Secured Party may require the Debtor to assemble the Collateral and deliver it, or make it available, to the Secured Party at any place and time designated by the Secured Party;

8

(i)    Remain on the premises of the Debtor without cost or charge to the Secured Party and to use the premises together with the materials, supplies, books and records of the Debtor for the purpose of collecting or liquidating the Collateral, whether by foreclosure, auction or otherwise; and

(j)    Also take possession of all personal property located in or attached to the Collateral without liability to the Debtor and may hold such personal property for the Debtor at the Debtor's expense.

Without limiting the generality of the foregoing, the Secured Party may sell, lease or otherwise dispose of the Collateral as a whole or in parts at one or more public or private sales or may retain all or any portion of the Collateral in satisfaction of the Obligations secured hereby, with notice of such retention sent to the Debtor if required by law.  Any public sale of the Collateral may be held at any premises of 1100 Main Ave, S.W., Washington, D.C. 20004, or premises of the Secured Party in Virginia.  The Secured Party may sell the Collateral at one time or at different times (with such postponements of sale as may be deemed appropriate by the Secured Party in its absolute discretion), for cash or credit, with such bidder's deposit and upon such other terms and conditions as the Secured Party shall deem appropriate in its absolute discretion.  At the option of the Secured Party, the Collateral may be sold as a whole or in such separate groupings of the Collateral and in such order as the Secured Party may deem appropriate in its absolute discretion.  No purchaser at any public or private sale of all or any part of the Collateral (other than the Secured Party) shall be required to see to the proper application of the purchase money.

The Secured Party's rights and remedies under this Security Agreement, at law and in equity, are cumulative, and the Secured Party may exercise all such rights and remedies without notice or demand to the Debtor.  The Secured Party's rights and remedies under this Security Agreement shall be in addition to (a) all rights which the Secured Party may have under the terms and provisions of the Obligations and the Security Instruments, (b) all rights of offset or setoff available to the Secured Party, and (c) all rights and remedies of the Secured Party at law or in equity.  Unless the Collateral is perishable and threatens to decline speedily in value or is a type customarily sold on a recognized market, the Secured Party shall give the Debtor at least ten (10) days prior written notice of the day, time and place of any public sale or of the day and time after which any private sale or any other intended disposition may be made, and the Debtor agrees that such notice shall be deemed to be reasonable under all circumstances.  If any sale of the Collateral be at public auction, the Secured Party may itself be a purchaser at such sale free from any right or equity or redemption of the Debtor, such right being hereby expressly waived and released.  The Secured Party's expenses of retaking, holding, preparing for sale and selling the Collateral (including, without limitation, attorneys' fees) shall be deemed advances to the Debtor by the Secured Party, and the repayment of such expenses shall be secured by this Security Agreement.

8.    Further Assurances.  The Debtor will from time to time execute such further instruments and do such further acts and things as the Secured Party may require by way of further assurance to the Secured Party of all of the rights and remedies of the Secured Party provided for or intended to be provided for in this Security Agreement.  The Debtor agrees to execute and deliver such financing statement or statements, or amendments thereof or supplements thereto, or other

9

instruments as the Secured Party may from time to time require in order to comply with the UCC and the laws of any jurisdiction in which all or any portion of any Collateral shall be located and to preserve and protect the security interests hereby granted. In the event the law of any jurisdiction other than Virginia becomes or is applicable to the Collateral or any part thereof or of any of the Obligations, the Debtor agrees to execute and deliver all such instruments and to do all such other things as may be necessary or appropriate to preserve, protect and enforce the security interests and liens of the Secured Party under the law of such other jurisdiction to at least the same extent as such security interests and liens of the Secured Party would be protected under the UCC.

9.     Proceeds Of Disposition Of Collateral By The Secured Party.    After deducting all costs and expenses of every kind incurred or incidental to the retaking, holding, advertising, preparing for sale and selling, leasing or otherwise disposing of the Collateral or in any way relating to the Secured Party's rights and remedies under this Security Agreement, including, without limitation, actual attorneys' fees and costs of any repairs deemed necessary or appropriate by the Secured Party, the Secured Party may apply the net proceeds of any sale, lease or other disposition of the Collateral to payment in full or in part of any one or more of the Obligations, whether or not then due and payable, in such order and to such of the Obligations as the Secured Party may elect in the exercise of its absolute discretion, making proper rebate for any unearned interest or discount, and only after full payment of all of the Obligations and any other payments the Secured Party may be required by law to make shall the Secured Party account to the Debtor for any surplus. The Debtor shall remain liable to the Secured Party for the payment of any deficiency in the payment of any of the Obligations after the sale, lease or other disposition of the Collateral.

10.     Governing Law.   This Security Agreement and the other related documents (a) have been negotiated, executed and delivered in the Commonwealth of Virginia, and (b) together with the rights and obligations of the parties hereunder and thereunder, shall be governed by, and construed and performed in accordance with, the laws of the Commonwealth of Virginia, except to the extent that the UCC provides for the application of other law with respect to the collateral.

11.     Jurisdiction.   The Debtor irrevocably submits to the non-exclusive jurisdiction of the Circuit Court of the City of Virginia Beach, Virginia and the United States District Court for the Eastern District of Virginia, and agrees that the Secured Party may, at its option, enforce its rights under the Security Agreement in such courts.

12.     Time.   Time is of the essence with regard to the performance of the covenants, terms and conditions of this Security Agreement.

13.     Failure To Exercise Rights.   Any failure by the Secured Party to exercise any right hereunder shall not be construed as a waiver of the right to exercise the same or any other rights at any time.

14.     Severability.   In the event any covenant, term or condition of this Security Agreement shall be held for any reason to be invalid, illegal, or unenforceable in any respect, the invalidity, illegality or unenforceability of such covenant, term or condition shall not affect the validity, legality or enforceability of the remaining covenants, terms and conditions of this Security

10

Agreement.

15.     <u>Successor And Assigns</u>.  The covenants, terms and conditions of this Security Agreement shall be binding on the heirs, personal representatives, successors and assigns of the Debtor and shall inure to the benefit of the Secured Party, its successors and assigns.

16.     <u>Waiver Of Right To Jury Trial</u>.  TO THE FULLEST EXTENT POSSIBLE, THE DEBTOR WAIVES IN FULL THE RIGHT TO A TRIAL BY JURY IN REGARD TO ANY DISPUTES, CLAIMS, CAUSES OF ACTION, OBLIGATIONS, DAMAGES, COMPLAINTS, LITIGATION OR ANY MATTER WHATSOEVER AND OF ANY TYPE OR NATURE, WHETHER IN CONTRACT, TORT OR OTHERWISE, WHICH THE DEBTOR MAY HAVE NOW OR IN THE FUTURE RELATING TO THIS SECURITY AGREEMENT OR ANY MATTER RELATING TO THE LOAN WHICH THIS SECURITY AGREEMENT EVIDENCES.  BY EXECUTION OF THIS SECURITY AGREEMENT, THE DEBTOR REPRESENTS AND WARRANTS THAT THE DEBTOR IS REPRESENTED BY COMPETENT COUNSEL WHO HAS FULLY AND COMPLETELY ADVISED THE DEBTOR OF THE MEANING AND RAMIFICATIONS OF THE RIGHT OF THE DEBTOR TO A TRIAL BY JURY OR HAD THE FULL AND COMPLETE OPPORTUNITY TO CONSULT SUCH COUNSEL AND CHOSE NOT TO DO SO, AND, THEREFORE, THE DEBTOR FREELY AND VOLUNTARILY WAIVES SUCH RIGHT TO TRIAL BY JURY.

17.     <u>Notices And Requests</u>.  Any notice or request which shall be given or may be given by the Debtor or the Secured Party under this Security Agreement must be in writing and shall be deemed to have been given by the sending party and received by the receiving party when any such notice or consent shall have been hand-delivered to the person designated below for such receiving party or three (3) days after such notice or request shall have been posted in the certified mail of the United States, postage prepaid, return receipt requested and addressed to the person designated for such receiving party at the address set forth in the introductory paragraph of this Security Agreement.

The Debtor or the Secured Party may change its designated person and/or its designated address at any time by giving notice of such change to the other party to this Security Agreement in the manner set forth in this section.

18.     <u>Counterparts; Telecopied Signatures</u>.  This Security Agreement may be executed in any number of counterparts and by different parties to this Security Agreement on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same agreement.  Any signature delivered by a party by facsimile transmission shall be deemed to be an original signature to this Security Agreement.

19.     <u>Waivers by Debtor</u>.  Debtor hereby waives, to the extent the same may be waived under applicable law: (a) all claims, causes of action and rights of Debtor against Secured Party on account of actions taken or not taken by Secured Party in the exercise of Secured Party's rights or remedies hereunder, under the Loan Documents or under applicable law; (b) all claims of Debtor for failure of Secured Party to comply with any requirement of applicable law relating to enforcement of Secured Party's rights or remedies hereunder, under the Loan Documents or under

11

applicable law; (c) all rights of redemption of Debtor with respect to the Collateral; (d) in the event Secured Party seeks to repossess any or all of the Collateral by judicial proceedings, any bond(s) or demand(s) for possession which otherwise may be necessary or required; (e) presentment, demand for payment, protest and notice of non-payment and all exemptions; (f) any and all other notices or demands which by applicable law must be given to or made upon Debtor by Secured Party; (g) settlement, compromise or release of the obligations of any person primarily or secondarily liable upon any of the Obligations; (h) all rights of Debtor to demand that Secured Party release account debtors from further obligation to Secured Party; and (i) substitution, impairment, exchange or release of any Collateral for any of the Obligations. Debtor agrees that Secured Party may exercise any or all of its rights and/or remedies hereunder, under the Security Instrument and under applicable law without resorting to and without regard to any Collateral or sources of liability with respect to any of the Obligations.

20.    Marshaling.  Secured Party shall not be under any obligation to marshal any assets in favor of the Debtor or any other person or against or in payment of any or all of the Obligations.

21.    Section Headings.  The section headings in this Security Agreement are for the convenience of the parties only and are to be given no substantive meaning or significance whatsoever in construing the terms and provisions of this Security Agreement.

22.    Indemnity Agreement.  The Debtor agrees to indemnify and save the Secured Party harmless from all liabilities, claims, losses, demands, damages, expenses and costs of every kind and nature (including, without limitation, actual attorneys' fees) arising under or in connection with this Security Agreement. Any liability, loss, damage, expense or cost incurred or suffered by the Secured Party arising under or in connection with this Security Agreement shall be part of the "Obligations" of the Debtor to the Secured Party, the payment of which shall be secured by this Security Agreement.

23.    Term Of The Security Agreement.  The term of this Security Agreement shall commence on the date hereof and shall terminate on the date when all of the Obligations have been irrevocably paid and fully satisfied or performed.

[SIGNATURES BEGIN ON NEXT PAGE]

12

IN WITNESS WHEREOF, authorized officers of the Debtor and the Secured Party have executed and sealed this Security Agreement as of the day and year first above written.

DEBTOR:                         DNM SEAFOOD, INC.,
                                a District of Columbia corporation

                                By: _____ (SEAL)
                                Name: _Sung J. Kim_____
                                Title: _president_____

                                _____ (SEAL)
                                SUNG JIN KIM

                                _____ (SEAL)
                                YONG WHA KIM

SECURED PARTY:                  PRUITT'S SEAFOOD, INC.,
                                a Virginia corporation

                                By: _Stewart B Pruitt_____ (SEAL)
                                Name: _Stewart B Pruitt_____
                                Title: _President_____

#440572 v2 - Security Agreement- Pruitt

13

# MANAGEMENT AGREEMENT

### May 3, 2004

Pursuant to terms of the Sales Agreement dated as of April 28, 2004, by and between **Pruitt's Seafood, Inc.** ("Seller"), and **DNM Seafood, Inc.** ("Purchaser"), and in order to comply with the rules and regulations of the District of Columbia acting on behalf of the United States of America, Purchaser is hereby authorized to manage the property to be operated under the name "Pruitt Seafood" located at 1100 Main Ave, S.W., Washington, D.C. 20004, and to operate the same in accordance with the laws of the District of Columbia.

The authority granted hereby will cease automatically upon the occurrence of the earlier of (i) the valid assignment of the Lease Agreement entered into by and between Seller and the District of Columbia acting on behalf of the United States of America, or (ii) the expiration of sixty (60) days from the date of this Agreement.

**PRUITT'S SEAFOOD, INC.**

By: _Stewart B. Pruitt_

Title: _President_

**DNM SEAFOOD, INC.**

By: _[signature]_

Title: _President_

#446435 v1 - Pruitt - Management Agreement

EXHIBIT
E



## WILLIAMS MULLEN

Direct Dial: 757.473.5393
mculpepper@williamsmullen.com

September 1, 2005

***VIA CERTIFIED MAIL / RETURN RECEIPT REQUESTED***
***VIA FEDERAL EXPRESS OVERNIGHT DELIVERY***
***VIA REGULAR MAIL***

Sung Jin Kim
Yong Wha Kim
DNM Seafood, Inc.
9208 Macswain Place
Springfield, Va. 22153

> Re:   *Pruitt's Seafood, Inc. ("Holder")*
> *DNM Seafood, Inc., Sung Jin Kim and Yong Wha Kim (collectively, the "Maker")*
> *Notice*

Dear Mr. and Ms. Kim:

This letter clarifies that notice sent to you on August 31, 2005. That Notice incorrectly identified DNM Seafood, Inc. as "DMN Seafood, Inc.". A modified restatement of that notice follows:

This firm represents the Holder of that certain note (the "Note") by and among the Maker and the Holder in the amount of Two Million Two Hundred Thousand and 0/100 Dollars ($2,200,000.00), dated as of May 3, 2004, secured by that certain Security Agreement by and between the Holder and the Maker, and perfected by that certain UCC Financing Statement recorded among the records of the Recorder of Deeds of Washington D.C.

This Note is in default for the Maker's non-payment of debts as they become due, as well as other defaults which may exist under the terms of the Note. We have received evidence of non-payment of certain debts to the following vendors in the approximate amounts listed below:

| | |
|---|---|
| (1) | O'Bier Seafood ($46,465.43) |
| (2) | PK Seafood (over $10,000.00) |
| (3) | Stavis Seafood ($15,247.80) |
| (4) | E. Goodwin & Son (over $10,000.00) |

*A Professional Corporation*



EXHIBIT
E



WILLIAMS MULLEN

Sung Jin Kim
Yong Wha Kim
September 1, 2005
Page 2

   (5)  Crocker & Windsor ($7,000.00)
   (6)  United Shellfish ($5,000.00)
   (7)  Great Northern (presently unknown)
   (8)  Sterling Seafood (presently unknown)
   (9)  Terrapin Fish Company (presently unknown)
   (10)  Bay City Seafood (presently unknown)
   (11)  Barry Group, Inc. ($12,000.00)
   (12)  Bay Hundred Seafood ($4,200.00)

   Demand is hereby made for you to pay these debts within 15 days of the preceding letter, in default of which, the Holder will exercise any or all of its rights contained in the Note, Security Agreement and/or otherwise at law and equity, including acceleration of the Note. Payment must be made in immediately available funds delivered to the undersigned or as otherwise directed by us.

   You are directed to correspond to me directly concerning these matters at the contact information provided herein.

   Please govern your actions accordingly.

       Sincerely,

       Michael A. Culpepper, Esq.



**WILLIAMS MULLEN**
HOFHEIMER NUSBAUM

Direct Dial: 757.629.0617
dgreer@williamsmullen.com

September 30, 2005

**_CERTIFIED MAIL RETURN RECEIPT_**
**_REQUESTED & REGULAR MAIL_**

Sung Jin Kim and Wong Why Kim
DNM Seafood Inc.
920 Macswain Place
Springfield, Virginia 22153

   **_RE:_** **_Pruitt's Seafood Inc._**
     **_DNM Seafood Inc., Sung Jin Kim and Wong Why Kim_**
     **_Notice of Default and Demand for Cure_**

Dear Mr. and Mrs. Kim:

  This firm represents Pruitt's Seafood Inc., holder of a note by and among DNM Seafood, Inc., Sung Jin Kim and Wong Why Kim ("Makers") in the initial amount of $2,200,000 dated May 3, 2004 ("Note") secured by a Security Agreement and perfected liens upon the assets of the Makers. The Makers received notice dated August 31, 2005 that the Note was in default for the Makers' failure to pay debts to certain vendors specified in that letter. We have not received any confirmation that you have corrected that situation.

  We were advised that you failed to make the full payment due under the Note on July 30, 2005, and that you have not paid any of the amount due on August 30, 2005. This letter shall constitute a "Notice to Cure" as provided in the Note, and demand is hereby made for payment within fifteen (15) days of the date of this letter, of the balance of the July payment of $7,407.00 plus the August installment payment of $14,811.15 plus late charges of $1,110.35 for a total of $15,551.00. The Note holder reserves all of its rights and remedies arising under the Note and at law, including recovery of attorneys' fees.

  If you fail to pay the demanded amount by October 16, 2005, the Noteholder, at its option, will accelerate the Note and all sums will be due under it, including interest at the rate of 10% per annum and the Noteholder's cost of collection. Payment must be made in immediately available funds.

*A Professional Corporation*

VIRGINIA &bull; WASHINGTON, D.C. &bull; LONDON
Dominion Tower, Suite 1700  999 Waterside Drive  P.O. Box 3460  Norfolk, VA 23514-3460  Tel: 757.622.3366  Fax: 757.629.0660
www.williamsmullen.com

1058605v1



**WILLIAMS MULLEN**
HOFHEIMER NUSBAUM

Sung Jin Kim and Wong Why Kim
September 30, 2005
Page 2

Inquiries regarding this matter should be directed to the undersigned.

Very truly yours,

David A. Greer

DAG:mra

cc:    Simon M. Osnos, Esquire

1058605v1

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **VIRGINIA EASTERN** | | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | Numerical Standing | |
| | | | | | | | | | U.S. | Circuit |
| **OVERALL CASELOAD STATISTICS** | Filings* | | 6,197 | 6,052 | 10,908 | 7,207 | 6,403 | 6,107 | U.S. | Circuit |
| | Terminations | | 5,950 | 6,014 | 10,209 | 7,183 | 6,199 | 5,785 | | |
| | Pending | | 3,507 | 3,465 | 3,505 | 2,954 | 2,986 | 2,904 | | |
| | % Change in Total Filings | Over Last Year | | 2.4 | | | | | 43 | 6 |
| | | Over Earlier Years | | | -43.2 | -14.0 | -3.2 | 1.5 | 62 | 8 |
| | Number of Judgeships | | 11 | 11 | 11 | 11 | 10 | 10 | | |
| | Vacant Judgeship Months** | | 4.5 | .0 | .0 | 9.5 | .0 | .3 | | |
| **ACTIONS PER JUDGESHIP** | FILINGS | Total | 564 | 550 | 991 | 655 | 640 | 611 | 22 | 2 |
| | | Civil | 409 | 394 | 843 | 552 | 533 | 505 | 32 | 3 |
| | | Criminal Felony | 115 | 126 | 122 | 103 | 107 | 106 | 17 | 2 |
| | | Supervised Release Hearings** | 40 | 30 | 26 | - | - | - | 12 | 1 |
| | Pending Cases | | 319 | 315 | 319 | 269 | 299 | 290 | 74 | 8 |
| | Weighted Filings** | | 544 | 558 | 634 | 566 | 618 | 597 | 25 | 3 |
| | Terminations | | 541 | 547 | 928 | 653 | 620 | 579 | 23 | 1 |
| | Trials Completed | | 31 | 32 | 31 | 36 | 39 | 42 | 9 | 1 |
| **MEDIAN TIMES (months)** | From Filing to Disposition | Criminal Felony | 5.1 | 5.1 | 4.7 | 5.1 | 5.2 | 5.1 | 6 | 1 |
| | | Civil** | 5.7 | 5.3 | 4.4 | 3.4 | 4.3 | 4.1 | 3 | 1 |
| | From Filing to Trial** (Civil Only) | | 9.2 | 8.0 | 9.0 | 9.9 | 8.2 | 9.4 | 1 | 1 |
| **OTHER** | Civil Cases Over 3 Years Old** | Number | 13 | 58 | 24 | 89 | 43 | 13 | | |
| | | Percentage | .5 | 2.5 | 1.0 | 4.2 | 1.9 | .6 | 4 | 2 |
| | Average Number of Felony Defendants Filed Per Case | | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 41.26 | 42.10 | 45.60 | 48.72 | 41.51 | 40.86 | | |
| | | Percent Not Selected or Challenged | 39.9 | 41.9 | 50.6 | 52.9 | 49.3 | 45.8 | | |

| 2004 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 4498 | 89 | 7 | 1265 | 38 | 27 | 309 | 426 | 1260 | 157 | 459 | 9 | 452 |
| Criminal* | 1251 | 99 | 7 | 259 | 9 | 38 | 442 | ** | 23 | 247 | 7 | 4 | 116 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."



EXHIBIT
6

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| **DISTRICT OF COLUMBIA** | | | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 3,121 | 3,461 | 3,382 | 3,377 | 3,682 | 3,984 | U.S. | Circuit |
| | Terminations | | 3,365 | 3,101 | 3,159 | 3,291 | 3,517 | 3,498 | | |
| | Pending | | 4,422 | 4,656 | 4,338 | 4,151 | 4,069 | 3,921 | | |
| | % Change in Total Filings | Over Last Year | | -9.8 | | | | | 84 | - |
| | | Over Earlier Years | | | -7.7 | -7.6 | -15.2 | -21.7 | 89 | - |
| | Number of Judgeships | | 15 | 15 | 15 | 15 | 15 | 15 | | |
| | Vacant Judgeship Months** | | .0 | 3.1 | 17.1 | 27.4 | 27.3 | 31.5 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 208 | 231 | 225 | 225 | 245 | 266 | 90 | - |
| | | Civil | 163 | 184 | 179 | 197 | 224 | 238 | 87 | - |
| | | Criminal Felony | 32 | 35 | 34 | 28 | 21 | 28 | 88 | - |
| | | Supervised Release Hearings** | 13 | 12 | 12 | - | - | - | 65 | - |
| | Pending Cases | | 295 | 310 | 289 | 277 | 271 | 261 | 78 | - |
| | Weighted Filings** | | 261 | 280 | 271 | 284 | 277 | 293 | 89 | - |
| | Terminations | | 224 | 207 | 211 | 219 | 234 | 233 | 89 | - |
| | Trials Completed | | 15 | 15 | 12 | 12 | 11 | 12 | 71 | - |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 12.8 | 10.2 | 9.6 | 7.7 | 7.2 | 7.3 | 91 | - |
| | | Civil** | 10.3 | 10.3 | 10.5 | 9.8 | 9.9 | 8.7 | 59 | - |
| | From Filing to Trial** (Civil Only) | | 27.4 | 25.0 | 29.0 | 24.0 | 24.0 | 24.0 | 65 | - |
| OTHER | Civil Cases Over 3 Years Old** | Number | 408 | 445 | 359 | 282 | 231 | 150 | | |
| | | Percentage | 12.8 | 12.7 | 11.1 | 8.6 | 6.9 | 4.6 | 87 | - |
| | Average Number of Felony Defendants Filed Per Case | | 1.5 | 1.3 | 1.4 | 1.3 | 1.4 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 75.49 | 85.69 | 93.32 | 69.99 | 80.53 | 75.71 | | |
| | | Percent Not Selected or Challenged | 50.4 | 56.6 | 55.7 | 51.9 | 56.8 | 53.9 | | |

| **2004 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2449 | 23 | 38 | 491 | 24 | 33 | 173 | 150 | 265 | 60 | 657 | 26 | 509 |
| Criminal* | 475 | 11 | 6 | 219 | - | 7 | 121 | ** | 4 | 40 | 7 | 4 | 56 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."



154 F.Supp.2d 10                                                                                      Page 1
154 F.Supp.2d 10, 2001 WL 849364 (D.D.C.)
**(Cite as: 154 F.Supp.2d 10, 2001 WL 849364 (D.D.C.))**

**H**

**Motions, Pleadings and Filings**

United States District Court,
District of Columbia.
INITIATIVE AND REFERENDUM INSTITUTE, et
al., Plaintiffs,
v.
UNITED STATES POSTAL SERVICE, Defendant.
**Civ.A.No. 00-1246 (RWR).**

July 24, 2001.

Nonprofit organizations and individuals who were engaged in efforts to place initiatives on state ballots challenged United States Postal Service regulation that prohibited gathering signatures for petitions on Postal Service property as applied to 12 district post offices. Postal Service moved to sever claims not related to properties within District Court's jurisdiction and to transfer severed claims to Districts in which post offices were located. The District Court, Roberts, J., held that: (1) claims were not subject to severance in interests of justice, and (2) although certain considerations weighed against transfer of claims to judicial districts in which affected post offices were located, parties would be ordered to brief options that would bifurcate proceedings or sever regionally contiguous distant post office claims.

Motions denied.

West Headnotes

**[1] Federal Civil Procedure** 81
170Ak81 Most Cited Cases
In suit challenging constitutionality of United States Postal Service (USPS) regulation prohibiting the gathering of signatures for petitions on USPS property as applied to 12 post offices, interests of justice did not support wholesale severance of claims relating to post offices outside district court's jurisdiction, where there was no misjoinder of parties, challenge to regulation involved common questions of law and questions of fact, and severance would have resulted in duplicative litigation. Fed.Rules Civ.Proc.Rule 21, 28 U.S.C.A.; 39 C.F.R. § 232.1(h)(1).

**[2] Federal Courts** 101
170Bk101 Most Cited Cases

**[2] Federal Courts** 103
170Bk103 Most Cited Cases
Courts have broad discretion in determining whether transfer is appropriate for the convenience of parties and witnesses, in the interest of justice. 28 U.S.C.A. § 1404(a).

**[3] Federal Courts** 101
170Bk101 Most Cited Cases

**[3] Federal Courts** 103
170Bk103 Most Cited Cases

**[3] Federal Courts** 104
170Bk104 Most Cited Cases
In exercising their discretion to transfer case for the convenience of parties and witnesses, in the interest of justice, courts must balance a number of case-specific factors, including the parties' private interests and the public interests, such as efficiency and fairness. 28 U.S.C.A. § 1404(a).

**[4] Federal Courts** 105
170Bk105 Most Cited Cases
Plaintiffs' forum choice should be afforded substantial deference unless that forum has no substantial connection with the parties or subject matter at issue. 28 U.S.C.A. § 1404(a).

**[5] Federal Courts** 106.5
170Bk106.5 Most Cited Cases
      (Formerly 170Bk106)
In suit challenging constitutionality of United States Postal Service (USPS) regulation prohibiting the gathering of signatures for petitions on USPS property as applied to 12 post offices, any transfer of claims solely for convenience of witnesses to districts in which 12 post offices were located was premature, given lack of information about identity and location of witnesses, notwithstanding unsubstantiated claim that witnesses were likely to reside in same region as post offices about which they would testify. 28 U.S.C.A. § 1404(a); 39 C.F.R. § 232.1(h)(1).

**[6] Federal Courts** 106.5
170Bk106.5 Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 F.Supp.2d 10
154 F.Supp.2d 10, 2001 WL 849364 (D.D.C.)
(Cite as: 154 F.Supp.2d 10, 2001 WL 849364 (D.D.C.))

(Formerly 170Bk106)

Although public and private interest considerations in avoiding duplicative litigation weighed against transferring claims challenging United States Postal Service (USPS) regulation as applied to 12 post offices to ten judicial districts in which those offices were located, possible unavailability for live testimony of non-government witnesses who resided outside forum and other concerns warranted consideration of two options: (1) bifurcating proceedings whereby one group of regionally contiguous post office claims was developed and tried first, followed by the second group; or (2) severing the regionally contiguous distant post office claims to be spun off to new pro bono counsel in that region. 28 U.S.C.A. § 1404(a); 39 C.F.R. § 232.1(h)(1).

*12 Ky Elaine Kirby, Daniel Eric Cohen, David F. Klein, Swindler, Berlin, Sheref & Friedman, L.L.P., Washington, DC, Arthur Barry Spitzer, Washington, DC, John R. Ferguson, Swindler, Berlin, Sheref & Friedman, L.L.P., Washington, DC, for Plaintiffs.

Marina Utgoff Braswell, U.S. Attorney's Office, Washington, DC, for Defendant.

### MEMORANDUM OPINION AND ORDER

ROBERTS, District Judge.

**1 Plaintiffs, individuals and associations gathering signatures to place initiatives on state ballots in upcoming elections, allege that a United States Postal Service ("USPS") regulation that prevents people from soliciting signatures for petitions on USPS property is unconstitutional as applied to twelve distinct post office properties. Defendant has moved to sever the eleven claims related to properties not within this Court's jurisdiction, and to transfer these claims to the nine different jurisdictions where the respective post offices are located. [FN1] Because the interests of justice weigh against the severance and transfer defendant seeks, defendant's motion will be denied.

> FN1. There is one claim that involves a post office in Washington, D.C. The other claims involve post offices located in Arizona (1), Florida (1), Idaho (1), Eastern Michigan (2), Western Michigan (1), Montana (1), Nevada (1), Oregon (2) and Utah (1).

### BACKGROUND

On June 28, 1998, USPS amended its regulation regarding the kinds of activities that were prohibited on postal property to read as follows:

> Soliciting alms and contributions, campaigning for election to any public office, collecting private debts, soliciting and vending for commercial purposes (including, but not limited to, the vending of newspapers and other publications), displaying or distributing commercial advertising, *soliciting signatures on petitions, polls, or surveys (except as otherwise authorized by Postal Service regulations),* and impeding ingress to or egress from post offices are prohibited.

39 C.F.R. § 232.1(h)(1) (2000) (" § 232.1(h)(1)") (emphasis added). Specifically, the new regulation added language prohibiting solicitation of signatures. The Initiative and Referendum Institute, a national nonprofit organization dedicated to assisting citizens' government participation through initiatives and referenda, together with other organizations and individuals, brought this suit challenging the amendment as applied to all post offices. [FN2]

> FN2. The organizations are Americans for Medical Rights, Citizens for Limited Taxation, Clean, The Humane Society of the United States, Nebraskans for Limited Terms, Oregonians for Fair Elections, Oregon Taxpayers United, and U.S. Term Limits.

Eight individual plaintiffs state in affidavits that after the amended § 232.1(h)(1) took effect, each was asked by a USPS employee to stop gathering petition signatures on postal property. (Pls.' Mot. Summ. J. Exs. 13, 15-21.) Plaintiffs moved for summary judgment, arguing that § 232.1(h)(1) is unconstitutional on its face and as applied to them because it is a content-based restriction on speech in a public forum and, therefore, the regulation is not narrowly tailored to serve a compelling state interest. Defendant also moved for summary judgment, arguing that exterior USPS property is a nonpublic forum and therefore § 232.1(h)(1) is valid because it is viewpoint-neutral and reasonable, and that even if the property at issue was a public forum, § 232.1(h)(1) is a valid time, place and manner regulation.

*13 Neither party, however, provided adequate information about the exact configuration of those locations or the actual physical attributes or historical use of any specific post office. Accordingly, this Court denied the parties' cross-motions for summary judgment for failing to show that there were no genuine issues of material fact. Plaintiffs filed an amended complaint, challenging the regulation as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

applied to twelve distinct post office properties. USPS has now moved to sever pursuant to Federal Rule of Civil Procedure 21 and to transfer pursuant 28 U.S.C. § 1404(a) all claims in the amended complaint regarding post offices located outside of this Court's jurisdiction.

## DISCUSSION

### I. *Severance*

**\*\*2** The parties do not dispute that each claim regarding a post office outside of the District of Columbia must be severed from the instant litigation before it can be transferred to the jurisdiction in which the post office property at issue is located. (Def.'s Mem. Supp. Mot. to Sever Claims and to Transfer ("Def.'s Mem.") at 6; Pls.' Mem. Opp'n to Def.'s Mot. ("Pls.' Opp'n") at 3.) USPS has moved to sever each such claim pursuant to Federal Rule of Civil Procedure 21. [FN3] "Claims against different parties can be severed for trial or other proceedings, under [Rule 21], if the Court determines in its discretion that the interests of justice would be served by doing so." *In re Vitamins Antitrust Litig.*, No. MISC 99-197, 2000 WL 1475705, at \*17 (D.D.C. May 9, 2000). In this case, defendant has not shown that any of the claims at issue were misjoined or involve different parties. Instead, defendant seems to be arguing that the Court should sever all claims relating to post offices outside the District of Columbia to serve the interests of justice.

> FN3. Rule 21 provides:
> Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately. Fed.R.Civ.P. 21.

[1] Joinder rules are interpreted to encourage "the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (denying severance where "plaintiffs' allegations allege a common series of transactions and occurrences and raise common questions of law and fact applicable to all defendants"). Here, plaintiffs' allegations raise common questions of constitutional law applicable to USPS and its regulation, § 232.1(h)(1). The same regulation will be applied to the facts regarding each

claim. All of plaintiffs' claims will require common factual inquiries into the public forum status of each of the postal properties. In addition, severing the case into ten separate actions would result in duplicative litigation, particularly when coupled with the transfers defendant seeks, and would waste vast amounts of judicial and litigant resources. Despite the number of post office properties involved, it is in the interests of justice to keep as many of plaintiffs' claims together in one case as would be fair to the parties. Accordingly, defendant's motion to sever all claims relating to post offices outside the District of Columbia will be denied.

### II. *Transfer*

As the parties have stated, defendant must succeed on its motion to sever before **\*14** the Court can entertain its motion to transfer under 28 U.S.C. § 1404(a). Since I have denied defendant's motion to sever, defendant's motion to transfer also will be denied.

[2][3] Even if this were a case where wholesale severance was appropriate, however, it is not in the interests of justice to transfer each claim regarding a different post office to nine different jurisdictions as defendant requests, thus necessitating litigation in ten different jurisdictions altogether. Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a) (West 2000). Courts have broad discretion in determining whether transfer is appropriate pursuant to section 1404(a). *See Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988). In exercising this discretion, courts must balance a number of case-specific factors, including the parties' private interests and the public interests, such as efficiency and fairness. *See id.* at 29-30, 108 S.Ct. 2239. In summary:
**\*\*3** The private interest considerations include: (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses ..., but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof. The public interest considerations include: (1) the transferee's familiarity with the governing laws; (2) the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home. *Trout Unlimited v. United States Dep't of Agric.,* 944 F.Supp. 13, 16 (D.D.C.1996) (footnotes omitted).

[4] Looking at the private interest factors in this case, plaintiffs' choice of forum and the balance of considerations of convenience to parties and witnesses tilts against wholesale transfer. Plaintiffs chose to file this action in the District of Columbia, and plaintiffs' forum choice should be afforded substantial deference unless that forum has no substantial connection with the parties or subject matter at issue. *See Wilderness Soc'y v. Babbitt,* 104 F.Supp.2d 10, 12 (D.D.C.2000) (citing *Islamic Republic of Iran v. Boeing Co.,* 477 F.Supp. 142, 144 (D.D.C.1979); *Hawksbill Sea Turtle v. FEMA,* 939 F.Supp. 1, 3 (D.D.C.1996); *Trout Unlimited,* 944 F.Supp. at 17; *Armco Steel Co. v. CSX Corp.,* 790 F.Supp. 311, 323 (D.D.C.1991); *Citizen Advocates for Responsible Expansion, Inc. v. Dole,* 561 F.Supp. 1238, 1239 (D.D.C.1983)). Here, the District of Columbia has a substantial connection to this controversy, the parties and the subject matter at issue. While it is true that post offices in all jurisdictions may be affected to varying degrees by the ruling in this case, defendant has not provided a sufficient reason for litigating this controversy outside of D.C.

[5] First, defendant argues that the claims should be transferred because testifying witnesses likely will be located in the same region as the post office about which they will testify. (Def.'s Mem. at 5.) In addition, defendant claims that transfer will be more convenient for plaintiffs, because "only one of the seventeen individually-named plaintiffs lives in [D.C.]." (*Id.*) Plaintiffs, however, state that "[f]our Plaintiffs reside in or are headquartered in the District of Columbia," "no Plaintiff resides *15 in three of the states to which USPS would have portions of this action transferred," and a single proceeding in the District of Columbia would be more convenient. (Pls.' Opp'n at 5.) On these points of disagreement over convenience to the plaintiffs, I will defer to plaintiffs' own judgment. Defendant's stronger argument involves witness locations. Although denying defendant's motion may cause witnesses employed in non-D.C. post offices to travel to testify in D.C., transferring these claims may cause potential witnesses for both parties--including the one witness defendant has identified to date--to travel to testify in multiple jurisdictions. [FN4] With almost no details

in the parties' motion papers regarding the identity and location of witnesses, though, a definitive finding on this argument would be premature. (Pls.' Opp'n at 6.)

> FN4. To the extent defendant argues that plaintiffs' projections about increased travel for USPS witnesses following severance is wholly speculative, it is no more speculative than defendant's argument that it may have to travel to take testimony from absent witnesses twice. (Def.'s Reply at 4 & n. 1.) In addition, defendant's apparent concern for plaintiffs' convenience in the event such multiple proceedings may occur, (*id.* at n. 1), does not support defendant's argument where deference must be given to plaintiffs' forum choice.

**4 Second, defendant argues that it would be at a disadvantage at trial if this Court denied its motion, because for relevant non-government employees beyond the subpoena power of this Court, the defendant would have to rely upon deposition,-rather than live--testimony obtained by traveling to the witnesses' jurisdictions. (Def.'s Mem. at 5.) That argument has force. The disadvantage to the defendant is apparent, although that does not end the balancing of factors. Defendant also argues that because certain physical and documentary proof is located at regional post offices, the Court and defendant could view those properties and documents only at substantial expense and inconvenience to each. (*Id.* at 6.) Plaintiffs counter that "[p]ictures, maps and diagrams would serve as more than an adequate substitute for traveling to and viewing the postal premises at issue" and, in any event, relevant substantial documentary records are "likely to be located at USPS headquarters in the District of Columbia." (Pls.' Opp'n at 7.) While it is defendant's prerogative to travel to each post office and obtain first-hand on-site evidence, defendant's desire to do this does not support its argument that transfer is necessary. Finally, the United States Postal Service will have more than adequate access to the U.S. mail system to transport documents in the most efficient and inexpensive manner available.

Third, plaintiffs--individuals, non-profit organizations and public interest groups with limited resources who are represented by counsel here on a *pro bono* basis--state that they cannot feasibly undertake the duplicative, piecemeal litigation in ten different jurisdictions that defendant now seeks. In addition, no plaintiff resides in three of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 F.Supp.2d 10                                                                          Page 5
154 F.Supp.2d 10, 2001 WL 849364 (D.D.C.)
**(Cite as: 154 F.Supp.2d 10, 2001 WL 849364 (D.D.C.))**

jurisdictions to which defendants would have the claims transferred, while four of the plaintiffs reside or are headquartered in D.C. Defendant has not shown that litigating one action in D.C. would inconvenience parties any more than would splitting up the claims across the country. In fact, defendant itself maintains its headquarters in D.C. where it issued and received comments on the regulation being challenged in this case. Further, the one witness whom defendant has identified thus far, Mr. Frederick J. Hintenach, works at USPS's D.C. headquarters and may have to travel to nine different jurisdictions outside of D.C. if defendant's motion is granted.

*16 Finally, the record before me reveals that plaintiffs' claims arose as a result of conduct and actions that occurred principally in the District of Columbia. Plaintiffs assert that "the regulation at issue was promulgated" in the District of Columbia, where "postal policy is set" and where substantial documentary records regarding the regulation are likely to have been created and maintained. (Pls.' Opp'n at 7.) Defendant has not argued otherwise. Therefore, the substantive claims alleged in plaintiffs' complaint arose principally in D.C. The private interest considerations in this case, then, weigh against transfer.

**5 [6] Turning to the public interest considerations, this Court has, as any federal district court would have, knowledge and familiarity with the constitutional issues presented in this case. Although defendant argues that each claim focuses on "specific factual issues pertaining to specific pieces of property," and while "[t]here is a local interest in having localized controversies decided at home," *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), this case involves a controversy over the constitutionality of a federal regulation that applies to every post office nationwide. It does not involve local property laws or statutes. In addition, the parties make no argument that congestion in the courts is a relevant factor in this analysis. Finally, defendant has not shown that litigating this controversy in ten different jurisdictions would promote efficiency or fairness. The public interest considerations in this case also weigh against transfer.

## CONCLUSION
Defendant has not shown that it is in the interests of justice to sever or transfer all claims relating to all post offices outside this jurisdiction. Plaintiffs' claims all raise common questions of law and will require

common factual inquiries. Judicial efficiency would be best served by keeping together as many of the claims as would be fair to the parties. Even if severance of all claims were appropriate, the public and private interest considerations weigh against transferring all claims.

However, defendant makes strong arguments concerning inconvenience to possibly necessary government witnesses outside of the District of Columbia, and concerning the possible unavailability for live trial testimony of non-government witnesses residing outside the area. These concerns are exacerbated by the fact that seven of the eleven non-D.C. post offices selected by plaintiffs are in the far western United States. Therefore, counsel are directed to confer and file supplemental memoranda concerning the following two options, or others they care to suggest: (1) bifurcating proceedings whereby one group of regionally contiguous post office claims is developed and tried first, followed by the second group; or (2) severing the regionally contiguous distant post office claims to be spun off to new *pro bono* counsel in that region. Accordingly, it is hereby,

ORDERED that defendant's Motion to Sever Claims and to Transfer [29-1], [29-2] be, and hereby is, DENIED without prejudice. It is further

ORDERED that counsel file supplemental memoranda by _____, 2001.

154 F.Supp.2d 10, 2001 WL 849364 (D.D.C.)

**Motions, Pleadings and Filings (Back to top)**

•          1:00CV01246              (Docket)
(Jun. 01, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                              Page 1
Not Reported in F.Supp., 1998 WL 34313581 (D.D.C.)
**(Cite as: 1998 WL 34313581 (D.D.C.))**

Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
NATIONAL DEVELOPMENT CORP., et al.,
Plaintiffs,
v.
FENETRES MQ, INC., et al., Defendants.
**No. Civ. 98-618(TFH).**

June 26, 1998.

Kevin I. Goldberg, Goldberg & Finnegan, LLC,
Silver Spring, MD, for Plaintiffs.

Erik Scott Jaffe, Erik S. Jaffe, P.C., Washington,
DC, for Defendants.

*MEMORANDUM OPINION*

HOGAN, J.

*1 Pending before the Court is the motion by
defendants Fenetres MQ, Inc., MQ Windows, Inc.
and North Shore Window & Door, Inc. to dismiss the
Amended Complaint. After reviewing the briefs and
materials submitted by the parties, the Court will
grant defendants' motion, because a valid forum
selection clause in the contract in question renders
this Court an improper venue.

I. Background

This case stems from an alleged breach of a contract
between plaintiff National Development Corporation
("NDC"), a renovation and construction company
with its principal place of business in the District of
Columbia, and Defendant Fenetres MQ, Inc.
("FMQ"), a window and door manufacturer with its
principal place of business located in Montreal,
Canada. Initially, Michael Minkoff, a representative
of NDC, met with John Graziano, an agent of FMQ,
to discuss the possibility of purchasing windows and
doors from FMQ. Based on Graziano's
representations, Minkoff went to Montreal on April
15, 1997, where he viewed some of FMQ's products.
The next morning, Minkoff returned to FMQ's office,
where he and Bernard LaPorte, a representative of
FMQ, executed a Preliminary Agreement in the
amount of $182,001.00 for the manufacture and
delivery of windows and doors. Plaintiffs aver, and
defendants do not dispute, that the contract was
signed by Minkoff as he rushed to the airport to catch

his flight home. Upon execution of the contract,
Minkoff also gave LaPorte a check for $55,000,
which, by oral agreement of both parties, was not to
be negotiated until the details of the contract were
worked out at a later date.

Included on the back of the Preliminary Agreement
was a forum selection clause which specified that
"[a]ny dispute regarding the present agreement will
be exclusively submitted to the jurisdiction of the
Court of the district of Montreal, Province of
Quebec." Plaintiffs claim that Minkoff did not read
the contract in detail, because he was rushing to catch
a flight home, and that he was therefore unaware of
the forum selection provision.

On or about April 24, 1997, Minkoff sent a
memorandum to LaPorte stating that FMQ was
authorized to negotiate the check provided that
certain clearly defined conditions were met. FMQ
subsequently negotiated the check, at which point
NDC canceled the contract. As a result of FMQ's
alleged breach of contract, Plaintiffs claim that NDC
was forced to install replacement windows and doors
for the summer at a cost of $29,000, which is
included in the damages they seek to recover.

Plaintiffs served their Complaint in this case on
March 11, 1998, and amended the Complaint on
April 8, 1998. Defendants request dismissal of the
Amended Complaint for lack of subject matter
jurisdiction, lack of personal jurisdiction, improper
venue, and failure to state a claim upon which relief
may be granted.

II. Discussion

The Court will grant defendants' motion to dismiss,
on the grounds that venue is improper. Plaintiffs'
election to file its Complaint in the district of this
Court runs counter to the valid and express forum
selection clause included in the Preliminary
Agreement. Because the Court will dismiss on these
grounds, it need not address defendants' other
arguments.

*2 A motion to dismiss is appropriate "only if 'it is
clear that no relief could be granted under any set of
facts that could be proven consistent with the
allegations." ' *Martin v. Ezeagu,* 816 F.Supp. 20, 23
(D.D.C.1993) (quoting *Hishon v. King & Spalding,*
467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 34313581 (D.D.C.)
**(Cite as: 1998 WL 34313581 (D.D.C.))**

plaintiffs are contractually barred from filing in this district. Since plaintiffs have not shown any reason to invalidate the forum selection clause, the Court will dismiss the Amended Complaint for improper venue. An order will accompany this opinion.

### *ORDER*

For the reasons stated in the Court's Memorandum Opinion, it is hereby

ORDERED that defendants' motion to dismiss is GRANTED; it is further

ORDERED that this case is DISMISSED WITHOUT PREJUDICE.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

DNM SEAFOOD, INC.                          )
                                           )
                    Plaintiff              )
                                           )
v.                                         )          Civil No. _____
                                           )
PRUITT'S SEAFOOD, INC., *et al.*           )
                                           )
                    Defendants             )

## ORDER

UPON CONSIDERATION of Defendants' Pruitt's Seafood, Inc. and Stewart B. Pruitt

(collectively "Defendants"), Motion to Transfer this case to the United States District Court for

the Eastern District of Virginia (Norfolk Division), pursuant to 28 USC 1404(a), and any

opposition thereto; it is hereby

ORDERED that the Motion is GRANTED and the Clerk shall transfer the file in this

matter to the aforesaid Court, and that this matter shall thereupon be stricken from the docket of

this Court.

Entered this ____ day of _____, 2005.


                         _____
                         U.S. District Judge

Copies to:

Karen A. Doner, Esq.
WILLIAMS MULLEN
8270 Greensboro Drive, Suite 700
McLean, VA  22102
Counsel for Defendants

William F. Devine, Esq.
WILLIAMS MULLEN HOFHEIMER NUSBAUM
1700 Dominion Tower
Post Office Box 3460
Norfolk, Virginia  23514-3460
Counsel for Defendants

Simon M. Osnos, Esq.
7700 Leesburg Pike, #434
Falls Church, VA  22043
Counsel for Plaintiff