# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DNM SEAFOOD, INC. | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | **Civil No. 05-2181EGS** |
| | ) | |
| **PRUITT'S SEAFOOD, INC.,** *et al.* | ) | |
| | ) | |
| **Defendants** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

### Introduction

Defendants, Pruitt's Seafood, Inc. ("Pruitt's Seafood"), and Stewart B. Pruitt ("Mr. Pruitt"), by counsel, respectfully move this Court to dismiss the Complaint filed against them in the Superior Court for the District of Columbia for the following reasons:

1.      Plaintiff has not stated a claim for fraudulent inducement under Rules 9(b) and 12(b)(6).

2.      Plaintiff's claimed reliance on alleged misrepresentations forming the basis for the fraudulent inducement claim (Count I) was unreasonable as a matter of law.

3.      The alleged misrepresentations which form the basis for plaintiff's fraudulent inducement claim (Count I) were not included in the Sales Agreement and are precluded by the merger clause in the Sales Agreement.

4.      The representations, warranties, and agreements set forth in the Sales Agreement only survived for three months following settlement under the Agreement and cannot serve as the basis for claims in this litigation, which was filed more than 16 months after closing under the Sales Agreement.

5.      Plaintiff waived any claims based on the assignment of the lease (Count II: Failure of Consideration and Rescission) because the Sales Agreement provided that the remedy for non-assignment was to declare the sales agreement null and void prior to closing under the Agreement.

6.      Plaintiff's equitable claims are barred by the doctrine of laches.

7.      Plaintiff's breach of contract claim (Count III) based on the condition of vessels is inconsistent with and is precluded by the terms of the Sales Agreement.

### Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defending party to file a motion to dismiss prior to filing an Answer if the Complaint fails to state a claim upon which relief can be granted.  A claim should be dismissed under Fed. R. Civ. P. 12(b)(6) if it appears that the plaintiff can prove no facts in support of his claims which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Further, in deciding such a motion, the Court can only rely upon the allegations in the complaint and those documents attached as exhibits or incorporated by reference. *Simons v. Montgomery County Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985).[1]  Although the Court accepts the factual allegations in the complaint and must construe them in the light most favorable to plaintiff, the Court is not required to accept conclusory allegations. *See Martin Marietta Corp. v. Int'l Telecommunications Satellite Org.*, 991 F.2d 94 (4th Cir. 1992); *Feazell v. Augusta County Jail*, 401 F. Supp. 405 (W.D. Va. 1975).

### Statement of Material Allegations

Plaintiffs allege that Sung Jim Kin, who later became the promoter, president, and majority shareholder of plaintiff, DNM Seafood, Inc. ("Plaintiff" or "DNM"), engaged in

---

[1] This motion is being filed simultaneously with defendants' motion to transfer this action to the United States District Court for Eastern District of Virginia (Norfolk Division).  Therefore, to the extent appropriate, defendants have cited to decisions from the Courts of Appeals for the District of Columbia and Fourth Circuits.

discussions over the period of two years with Mr. Pruitt regarding the sale of the Pruitt's

Seafood's retail fish market business operated on the Maine Avenue waterfront in the District of

Columbia. *See* Complaint ¶ 5. DNM asserts that discussions regarding price were based upon

Mr. Pruitt's representations concerning "earnings he derived from his employment with, and

ownership of, Pruitt's Seafood." Complaint ¶ 6. The parties entered into a Sales Agreement

dated April 28, 2004, which provided for DNM's purchase of certain assets of the business on

specified terms. *See* Complaint ¶ 8. The Sales Agreement called for a total purchase price of

$3,000,000, to be paid by a down payment of $650,000 and execution of two promissory notes

totaling $2,350,000. *See* Complaint ¶ 9. DNM asserts that it was fraudulently induced to

execute the Sales Agreement "by the intentional, malicious and material misrepresentations of

the defendant's agent and major shareholder, Stewart B. Pruitt, on which plaintiff's promoter,

president and majority shareholder, Sung Jin Kim, did reasonably rely." *See* Complaint ¶ 10.

**I.    COUNT I (FRAUDULENT INDUCEMENT)**

In Count I (Fraudulent Inducement), DNM asserts:

a.    "… Stewart B. Pruitt falsely stated that he personally received one million dollars

($1,000,000.00) per year from the seafood business, derived from his employment with, and

ownership interest in, Pruitt's Seafood, Inc., and that the $3,000,000.00 purchase price for the

corporation's assets was based on his existing earnings level." Complaint ¶ 11.

b.    "Plaintiff's agent Sung Jin Kim asked Pruitt numerous times for his personal tax

returns in order the verify Pruitt's statements. Pruitt said on numerous occasions that he would

obtain his tax returns from his accountants and deliver them to Kim, but he never did so. Upon

each request by Kim, Pruitt reiterated that his earnings amounted to $1,000,000.00 per year and

that Kim should trust his representations." Complaint ¶ 12.

3

c.      "Based on the retail sales volume generated by plaintiff through its post-closing operation of the Pruitt Seafood assets, using the same personnel and method of operation as defendant, and based on plaintiff's cost-of-goods as a percentage of retail prices, plaintiff has concluded that the pre-contract and pre-settlement statements by Stewart B. Pruitt as to the earnings of the business were false." Complaint ¶ 14.

d.      "On information and belief, the sales of Pruitt Seafood, Inc. had been declining in the years prior to the parties' contract and the company sales were nowhere near sufficient to generate net earnings and benefits of $1,000,000.00 to Stewart B. Pruitt." Complaint ¶ 15.

e.      "Plaintiff has been damaged by the material false representations of defendant's agent, Stewart B. Pruitt. The defendant's on-going retail fish market business was worth far less at the time of purchase than it would have been worth had the defendant's representations as to prior earnings been true. The $3,000,000.00 contract value of the business was based on alleged earnings and profits accruing to Stewart B. Pruitt of $1,000,000.00 per year." Complaint ¶ 17.

f.      "The true value of the business is substantially lower than $3,000,000.00, and, based on the parties' negotiations, is worth no more than three (3) times Stewart B. Pruitt's average annual earnings and profits from the corporation during the two (2) calendar years prior to execution of the contract on April 28, 2004." Complaint ¶ 18.

g.      "But for the false statements of Stewart B. Pruitt, plaintiff would not have purchased the defendant corporation's retail seafood market assets, and plaintiff would not have spent money, to the extent of $300,000.00, to repair numerous defects in the barges and cook-boat conveyed by defendant corporation to plaintiff." Complaint ¶ 19.

h.      "Plaintiff has been damaged by defendants' fraud and is entitled to rescind this transaction and recover back all monies paid towards acquisition of the seafood market assets as

4

well as an amount equal to all expenditures made to put the barges and cook-boat in seaworthy condition." Complaint ¶ 20.

## II.     COUNT II (FAILURE OF CONSIDERATION AND RESCISSION)

In Count II (Failure of Consideration and Rescission), DNM asserts:

a.      "The parties' April 28, 2004 contract provided that the agreement was subject to the parties obtaining assignment of the existing dock lease agreement between seller and the District of Columbia as agent for the United States government." Complaint ¶ 22.

b.      "The parties closed the transaction on May 4, 2004, prior to the District's approval of the lease assignment, under a so-called 'Management Agreement' which was to terminated upon the earlier of (i) valid assignment of the lease, or (ii) sixty (60) days after the closing.   Plaintiff has paid substantial fees to the defendants pursuant to the 'Management Agreement' and subsequent to expiration of the management agreement." Complaint ¶ 23.

c.      "To date, despite diligent effort, plaintiff has been unable to obtain an assignment of the lease and the 'Management Agreement' has expired by its terms." Complaint ¶ 24.

d.      "The non-assignment of the lease represents a failure of consideration and plaintiff is entitled to rescind this transaction and recover back all monies paid towards acquisition of the seafood market assets as well as an amount equal to all expenditures made to put the barges and cook-boat in seaworthy condition." Complaint ¶ 25.

## III.    COUNT III (BREACH OF CONTRACT)

In Count III (Breach of Contract), DNM alleges:

a.      "Under [¶ 6(a)] of the Sales Agreement, the defendant corporation promised that all equipment conveyed to the plaintiff would be in good working order, reasonable wear and tear excepted." Complaint ¶ 27.

b.      "As of settlement, the barges and cook-boat conveyed by plaintiff were in poor and unseaworthy condition, in breach of the Sales Agreement." Complaint ¶ 28.

c.      "Plaintiff has spent at least three hundred thousand dollars ($300,000.00) to remedy the defects in the barges and the cook-boat, and will be required to spend an additional $500,000.00 to restore the vessels to seaworthy condition, and defendant corporation is liable to pay that amount in damages to plaintiff." Complaint ¶ 29.

## Material Terms of Sales Agreement

DNM refers to, but does not attach a copy of, the Sales Agreement dated April 28, 2004. The Court is not obligated to accept as true plaintiff's allegations concerning the terms of the written agreement; instead, the Court should review and apply the terms of the actual document. *See Gasner v. Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995) ("when a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss the complaint"); 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil §1327 at 438-39 (3d ed. 2004) ("[W]hen the plaintiff fails to introduce a pertinent document as part of her pleading, a significant number of cases throughout the federal court system make it clear that the defendant may introduce the document as an exhibit to a motion attacking the sufficiency of the pleading; that certainly will be true if the plaintiff has referred to the item in the complaint and it is central to the affirmative case."). A copy of the Sales Agreement is attached as Exhibit A to this Memorandum of Law.

The following provisions of the Sales Agreement are pertinent to the Court's consideration of plaintiffs' claims:

1.      **Sale of Business.**  The Seller [Pruitt's Seafood] shall sell, convey, and transfer to the Purchaser [DNM], free and clear of all liabilities, obligations, and encumbrances, the assets of the Business [that certain business known as "Pruitt's Seafood"] owned and operated by the Seller at the Premises [1100 Maine Avenue,

S.W., Washington, D.C.], including, but not limited to, the trade name and goodwill of the business as a going concern, transferable licenses, the equipment, furniture, fixtures, including inventory, and all other tangible and intangible property rights, used and enjoyed by the Seller in connection with the Business (the "Assets"), except for cash on hand or in bank accounts, accounts receivable, security deposits with the landlord and those assets listed on <u>Exhibit A</u> hereto.

**2.    Purchase Price.**  The total purchase price that the Purchaser shall pay to the Seller shall be the sum of THREE MILLION DOLLARS ($3,000,000.00), which shall be paid as follows:

a)    the sum of Fifty Thousand Dollars ($50,000.00) as earnest money deposit (the "Deposit") …;

b)    the sum of Six Hundred Fifty Thousand Dollars ($650,000.00) in cash or certified funds at the settlement, of which the aforesaid deposit shall be a part;

c)    the sum of One Hundred Fifty Thousand Dollars ($150,000.00) by executing a promissory note ("Note I") in the same amount with no interest at the settlement.  Said note shall be paid in one lump sum on or before July 31, 2004.

d)    The sum of Two Million Two Hundred Thousand Dollars ($2,200,000.00) by executing a promissory note ("Note II") in the same amount with annual interest at [4.2%].  Said note shall be fully amortized for a term of [17 ½] years and be paid in consecutive monthly installments of [$14,811.15] with the first installment due in thirty (30) days from the settlement date ….

e)    \*\*\*

\*                    \*                    \*

**5.    Representations and Warranties of Seller.**  The Seller warrants, represents, and agrees as follows:

a)    At settlement, it shall have good and marketable title to and own outright all properties and assets to be transferred hereunder.

b)    \*\*\*

c)    All material tax returns for federal, state and local income, withholding, retail sales, personal property, excise, and franchise taxes required by law to be filed by the Seller, prior to the date of this Agreement, have been filed, or shall be filed forthwith, and all such taxes as may accrue through the settlement date shall be paid by the Seller on a timely basis, or will be timely satisfied from Seller's cash proceeds at the settlement.

d)    ***

6.    **Covenants of Seller.**  The Seller covenants with the Purchaser as follows:

a)    The Bill of Sale, Affidavit of No Creditor, and instruments of assignment to be delivered at the settlement will transfer all of the Assets free and clear of all encumbrances, and will contain the usual warranties and affidavit of title.  The equipment, furniture and fixture conveyed shall be in good working order, reasonable wear and tear excepted, on the settlement date and the Seller agrees to make all necessary repairs to the equipment, furniture and fixture in the event it is found at the time of settlement to be not in working order.  Purchaser shall be allowed to inspect the equipment, furniture and fixture the day before the settlement at its own costs and expenses.

b)    ***

c)    ***

\*                              \*                              \*

9.    **Contingencies.**  This Agreement is subject to the following contingencies, non-satisfaction of any or all of which on or before the settlement date shall entitle either party to hold this Agreement null and void in its entirety:

a)    The parties obtaining assignment of the existing lease agreement for the Premises from the District of Columbia Government; and,

b)    Purchaser and Purchaser's attorney being satisfied with the terms and conditions of the existing lease agreement for the Premises.  Purchaser and Purchaser's attorney shall be given ten (10) days immediately following ratification of this Agreement to review the lease agreement.

In the event that either party holds this Agreement null and void in its entirety due to non-satisfaction of any of the aforesaid contingencies, Purchaser shall be entitled to receive any and all monies paid hereunder forthwith.  In the event that Purchaser holds this Agreement null and void for any reason other than the aforesaid contingencies, Seller shall be entitled to receive the Deposit.

\*                              \*                              \*

13.    **Survival of Representations, Warranties, and Agreements.**    The representations, warranties, indemnities, and agreements set forth herein and/or made pursuant to this Agreement shall remain operative and shall survive settlement under this Agreement for three (3) months.

**14.   Entire Agreement.**  This Agreement represents the entire agreement of the parties relating to the purchase and sale of the Business.  All prior negotiations and agreements between the parties are merged in this Agreement and there are no understandings or agreements other than those incorporated herein.   This Agreement may not be modified or altered, except by an instrument in writing duly executed by the parties hereto.

**Argument**

**I.   PLAINTIFF HAS NOT STATED A CLAIM FOR FRAUDULENT INDUCEMENT UNDER RULES 9(b) AND 12(b)(6).**

DNM's fraudulent inducement claim (Count I) is based on Mr. Pruitt's alleged representations "regarding earnings which he derived from his employment with, and ownership interest in, Pruitt Seafood."  Complaint ¶ 6.  Specifically, DNM alleges that (a) Mr. Pruitt "falsely stated that he personally received ... $1,000,000.00 ... per year from the seafood business, derived from his employment with, and ownership interest in, Pruitt's Seafood;" (b) the $3,000,000.00 purchase price for the assets of Pruitt's Seafood "was based on Mr. Pruitt's existing earnings level;" (c) Mr. Kim "asked Mr. Pruitt numerous times for his personal tax returns in order the verify" these alleged statements; (d) Mr. "Pruitt said on numerous occasions that he would obtain his tax returns from his accountant an deliver them to Kim, but never did so;" and (e) Mr. Pruitt "reiterated that his earnings amounted to $1,000,000.00 per year and that Kim should trust his representations."  *See* Complaint ¶¶ 11-12.  In addition, DNM alleges that "[b]ased on the retail sales volume generated by plaintiff through its post-closing operation of the Pruitt Seafood assets, using the same personnel and method of operation as defendant, and based on plaintiff's cost-of-goods as a percentage of retail prices, plaintiff has concluded that the pre-contract and pre-settlement statements by Stewart B. Pruitt as to the earnings of the business were false."  Complaint ¶ 14; *see also* Complaint ¶ 15 ("On information and belief, the sales of Pruitt Seafood, Inc. had been declining in the years prior to the parties' contract and the company

sales were no where near sufficient to generate net earnings and benefits of $1,000,000.00 to Stewart B. Pruitt.").

These alleged misrepresentations concerning Mr. Pruitt's income from the business are insufficient as a matter of law to support a fraudulent inducement claim.  In order to state a claim for rescission or damages based upon fraudulent inducement to a contract, plaintiff must allege: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) (citing *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 439 S.E.2d 387, 390 (1994); *Spence v. Griffin*, 236 Va. 21, 28, 372 S.E.2d 595, 598 (1988)).[2]

Further, Fed. R. Civ. P. 9(b) requires that "[i]n all averments of fraud... the circumstances constituting fraud ... shall be stated with particularity."  In order to meet the heightened pleading requirements under Rule 9(b), plaintiff must allege the time, place, and content of each false representation, the fact represented, and what was gained or given up as a consequence of the alleged fraud.  *See In re U.S. Office Prods. Co. Secs. Litigation*, 251 F.Supp.2d 77, 100 (D.D.C. 2003); *Owen v. Commercial Union Fire Ins.*, 211 F.2d 488 (4th Cir. 1954); *Sweeney Co. v. Engineers-Constructors, Inc.*, 109 F.R.D. 358, 360 (E.D. Va. 1986); *see also* Wright & Miller, *supra*, at §§ 1296-1312 (detailing history, salutary purpose, and requirements of Rule 9(b)).

> A wide variety of reasons have been advance for requiring particularity in the pleading of fraud ....  First, it has been said by innumerable federal courts that the requirement in Rule 9(b) is necessary to safeguard potential defendants from lightly made claims charging the commission of acts that involve some degree of moral turpitude.  The notion is that a heightened pleading requirement imparts a note of seriousness and encourages a greater degree of pre-institution investigation by the plaintiff.

---

[2] Virginia law governs the claims in this case. *See* Sales Agreement ¶ 15 ("This Agreement shall be governed by the laws of the Commonwealth of Virginia.").

Wright & Miller, *supra*, § 1296 at 31 (citing "[a]n extensive range of cases from all over the country illustrating the notion that the pleading rule is for the protection of the defendant's reputation and goodwill ...."); *see, e.g., Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1036 (4th Cir. 1997). Many courts "have expressed the view that allegations of fraud ... frequently are advanced only for their nuisance or settlement value and with little hope that they will be successful on the merits; indeed, there actually may be little or no incentive to secure adjudication of the claim in some instances. Thus, unfounded fraud claims should be identified and disposed of early." Wright & Miller, *supra*, § 1296 at 37.

Two justifications for the heightened pleading requirements of Rule 9(b) are particularly relevant to this case:

> [S]ince assertions of fraud ... often are involved in attempts to reopen completed transactions ..., courts are unwilling to entertain charges of this type unless they are based on allegations that are sufficient to warrant the risks and difficulties inherent in the re-examination of old and settled matters. The utility of promoting stability in economic transactions have considerable force and might be compromised if fraud claims were easy to assert.
>
>    *      *      *
>
> Finally, as has been pointed out by several commentators, the old cliché ... that actions or defenses based on fraud are disfavored and therefore must be scrutinized by the courts with great care because claims of this type often form the basis for "strike suits" still retains considerable vitality.

*Id.* at § 1296 at 37-38, 45-47 (footnotes omitted; citing numerous cases). Plaintiff is seeking to reopen a completed transaction in this case, and has taken the offensive in a classic "strike suit" seeking rescission of the transaction following notice of default under the promissory note given in payment of the purchase price for the assets.

**A.    Time, Place, and Content of Allegedly False Representation**

Plaintiff has not set forth the time, place, and content of the alleged misrepresentations which form the basis of the fraudulent inducement claim with the specificity required by Rule 9(b). *Sweeney*, 109 F.R.D. at 360 (finding that allegation of fraud without any specific designation in the pleadings as to "what false statements were made by plaintiff, when they were made, wherein they were material or in what respect they were false" was a clear violation of Rule 9(b)). Moreover, the allegations in the Complaint do not contain all elements of a fraud claim. For these reasons, the Court should dismiss Count I.

Plaintiff alleges that (a) Messrs. Kim and Pruitt engaged in discussion over the period of two years ending on April 28, 2004, concerning the sale of the fish market business; (b) "[a]ll discussions regarding the price of the assets were based on representations made by [Mr.] Pruitt regarding earnings which he derived from his employment with, and ownership interest in, Pruitt Seafood;" (c) Mr. Pruitt stated that he received $1 million per year from the seafood business, derived from his employment with, and ownership interest in, Pruitt Seafood; and (d) based on post-settlement performance under new ownership, "plaintiff has concluded that the pre-contract and pre-settlement statements by [Mr.] Pruitt as to the earnings of the business were false." *See* Complaint ¶¶ 5, 6, 11, 12, and 14. These allegations fall well short of the standards of Rule 9(b) and do not make out a fraud claim.

Plaintiff opted to paraphrase Mr. Pruitt's alleged statements rather than to state the words spoken. In addition, plaintiff has omitted the exact time of the alleged misstatements. Finally, plaintiff mixes several economic concepts in discussing the alleged misrepresentations.

Plaintiff refers to alleged representations concerning "earnings [Mr. Pruitt] derived from his employment with, and ownership interest in, Pruitt Seafood." Complaint ¶ 6. Next, plaintiff

talks about the amount of money Mr. Pruitt "personally received ... per year from the seafood business, derived from his employment with, and ownership interest in, Pruitt's Seafood." Complaint ¶ 11. Later, plaintiff refers to alleged statements concerning Mr. Pruitt's "earnings." Complaint ¶ 12. When addressing the conclusion that Mr. Pruitt's alleged statements were incorrect, plaintiff refers to the "earnings of the business." Complaint ¶ 14. When addressing the value of the business, however, plaintiff discusses Mr. Pruitt's "average annual earnings and profits from the corporation" during the two years prior to execution of the Sales Agreement. Complaint ¶ 18; *see also* Complaint ¶ 17 ("The ... contract value of the business was based on alleged earnings and profits accruing to [Mr.] Pruitt ....").

The different economic concepts addressed in the Complaint are material to an assessment of the fraud claims, and highlight the importance of knowing with specificity what words plaintiff claims Mr. Pruitt said and whether the words spoken were false. In addition, the vague allegations concerning the timing of the discussions relating to the transaction ("[o]ver a two (2) year period ending April 28, 2004" (Complaint ¶ 5)), make it very important to know when plaintiff alleges that Mr. Pruitt made each statement, as the truth of any statement about past earnings or financial performance – to the extent relevant at all – must be judged based upon financial information at and before the time of the statement.

Finally, plaintiff does not clearly allege that Mr. Pruitt's alleged were false. Instead, plaintiff alleges that based on post-closing operation of the business under new management, "plaintiff has concluded that the pre-contract and pre-settlement statements by Stewart B. Pruitt as to the earnings of the business were false." Complaint ¶ 14. As noted above, however, plaintiff never alleges that Mr. Pruitt made any representation concerning "earnings of the business." Instead, plaintiff alleges that Mr. Pruitt made representations concerning the earnings

he derived from his employment with and ownership of Pruitt's Seafood. *See* Complaint ¶ 14. Plaintiff's conclusions concerning earnings of he business based upon post-closing performance of the business under new management do not support the conclusion that some statement made by Mr. Pruitt at some unspecified time during the two years leading up to execution of the Sales Agreement concerning earnings he derived from his ownership of and employment by Pruitt's Seafood was false.

Plaintiff has failed to properly allege facts regarding the time, place, and content of the alleged misrepresentation as required by Rule 9(b). Moreover, the Complaint fails to state a cause of action from fraud, and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

### B.    Of a Material Fact

Plaintiff not only failed to allege that Mr. Pruitt's representations were false, it also failed to properly allege that the representation was of a material fact. "[A] fact is material when it influences a person to enter into a contract, when it deceives him and induces him to act, or when without it the transaction would not have occurred." *Spence*, 236 Va. at 28, 372 S.E.2d at 598. Although plaintiff claims that Mr. Pruitt's alleged statements "induced" it to execute the Sales Agreement, plaintiff also admits that "Sung Jin Kim asked Pruitt numerous times for his personal tax returns in order to verify Pruitt's statements," that the parties engaged in discussions regarding the sale of the business over a period of two years, and Kim had not received Mr. Pruitt's tax returns at the time the Sales Agreement was executed. *See* Complaint ¶¶ 5, 10-13. The Sales Agreement specifically included a section regarding contingencies. *See* Sales Agreement ¶ 9. Mr. Pruitt's tax records, earnings, or financial records were not the subject of any contingency.

Moreover, the Sales Agreement also provides: "This Agreement represents the entire agreement of the parties relating to the purchase and sale of the Business. **All prior negotiations and agreements between the parties are merged in this Agreement and there are no understandings or agreements other than those incorporated herein.**" Sales Agreement ¶ 14 (emphasis added). Pursuant to Paragraph 14, statements made during the course of negotiations, including Mr. Pruitt's alleged representations, were merged into the Sales Agreement. If Mr. Pruitt's alleged statements during contract negotiation were material, plaintiff would have included these "representations" in the Sales Agreement as provided by Paragraph 14.[3]

### C.    Made Intentionally and Knowingly

Not only has plaintiff failed to sufficiently allege a false representation of a material fact, plaintiff also cannot allege that such representation was made intentionally and knowingly. The fact that plaintiff does not even know if Mr. Pruitt's alleged statements were true or false precludes any good faith allegation that Mr. Pruitt *intentionally and knowingly* made a false representation.

### D.    With Intent to Mislead

Likewise, because plaintiff does not even know if Mr. Pruitt's alleged statements were true or false, there is no basis for the conclusory assertion that Mr. Pruitt intentionally and knowingly made a false representation with the *intent to mislead plaintiff.*

### E.    Reliance by the Party Misled

Although plaintiff alleges that it was induced to execute the Sales Agreement based upon Mr. Pruitt's statements, it does not, and cannot, allege that it was misled. Plaintiff has asserted only that it has *concluded* that Pruitt's statement could not have been true, based upon the

---

[3] This issue is addressed in greater detail in Section III, below.

performance of the business under new ownership since plaintiff purchased and began operating it. *See* Complaint ¶ 14. The fact that plaintiff asserts that it was induced into executing the Sales Agreement because it has now concluded the statement of Stewart Pruitt must have been false, is not sufficient to establish that it was misled and consequently relied upon a false representation of the other party.

It is not enough for a plaintiff in a fraud action to show that he acted to his detriment in response to the defendant's misrepresentation. *Hitachi*, 166 F.3d at 629. "[O]ne who seeks to hold another in fraud must clearly show that he has relied upon the acts and statements of the other." *Harris v. Dunham*, 203 Va. 760, 767, 127 S.E.2d 65, 70 (1962) (citing *Costello v. Larsen*, 182 Va. 567, 571, 29 S.E.2d 856 (1944)). Further, the law provides that plaintiff's reliance upon the representation must be reasonable and justified. *Hitachi*, 166 F.3d at 629 (citing Meridian Title Ins. Co. v. Lilly Homes, Inc., 735 F. Supp. 182, 185 (E.D. Va. 1990) (interpreting Virginia law), *aff'd*, 934 F.2d 319 (4th Cir. 1991)). Even if the facts alleged by plaintiff are taken as true, plaintiff has alleged no facts to demonstrate that its reliance upon the alleged representation was reasonable and justified, as required by law.[4]

**F.      Resulting Damage to the Party Misled**

Because plaintiff has failed to allege the first five elements of fraud, it necessarily follows that it failed to sufficiently allege damage resulting from reliance upon a false representation made intentionally and knowingly by the other party with the intent to mislead. Because plaintiff failed to allege the very foundation of a fraud claim – a false representation – the remaining elements of fraud, which build upon and include the fundamental false representation, cannot be properly alleged. *See In re U.S. Office Prods. Co. Secs. Litigation*, 251 F.Supp.2d 77, 100 (D.D.C. 2003) ("Accordingly, fraud claims must plead facts capable of establishing each of the

---

[4] This issue is addressed in greater detail in Section II, below.

requisite elements of fraud. Allegations in the form of conclusions on the part of the pleader as to the existence of fraud are insufficient."). Therefore, the Court should dismiss the fraudulent inducement claim (Count I).

## II.    PLAINTIFF'S CLAIMED RELIANCE ON ALLEGED MISREPRESENTATIONS FORMING THE BASIS FOR THE FRAUDULENT INDUCEMENT CLAIM (COUNT I) WAS UNREASONABLE AS A MATTER OF LAW.

In a fraudulent inducement claim, plaintiff's reliance upon the representation must be reasonable and justified. *Hitachi*, 166 F.3d at 629 (citing Meridian, 735 F. Supp. at 185) (interpreting Virginia law). "[A] party induced to enter into a contract by misrepresentation must be justified in relying upon it under all the circumstances." *Poe v. Voss*, 196 Va. 821, 827, 86 S.E.2d 47 (1955) (quoting West End Co. v. Claiborne, 97 Va. 734, 751, 34 S.E. 900 (1900)). "[T]he promisee must have had a right to rely on the promisor's representations, or, put another way, the false representation is made in a way so as to induce a reasonable man to believe it." *Lowe's Island Ltd. Pt'p v. NVKettler Ltd. Pt'p*, 1991 WL 835182, at *3 (Va. Cir. 1991) (copy attached) (citing *Jefferson Standard Life Ins. Co. v. Hedrick*, 181 Va. 824, 833, 27 S.E.2d 198 (1943)).

The touchstone of reasonableness is prudent investigation. *Hitachi*, 166 F.3d at 629. "In circumstances where a prudent buyer would have conducted an investigation and, thereby, discovered the seller's misstatement, a buyer who fails to make such an investigation may not assert fraud based on the factual misrepresentation." *Hoover Universal, Inc. v. Brockway Imco, Inc.*, 809 F.2d 1039, 1044 (4th Cir. 1987) (applying Virginia law).

Where the party to whom the misrepresentation was made has "recourse to the proper means of obtaining information," he is given sufficient opportunity to examine the real facts, and his attention is "directed to the sources of information," the "plainest motives of expediency and

17

of justice require that he should be charged with all the knowledge which he might have obtained had he pursued the inquiry to the end with diligence and completeness." *Poe*, 196 Va. at 827 (quoting West End, 97 Va. at 751, 34 S.E. 900). Such a party "cannot claim to have relied upon the misrepresentation and to have been misled by it." *Id.*

"Where ordinary care and prudence are sufficient for full protection, it is the duty of the party to make use of them." *Costello v. Larsen*, 182 Va. 567, 571, 29 S.E.2d 856, 858 (1944) (quoting *Lake v. Tyree*, 90 Va. 719, 723, 19 S.E. 787 (1894)).

> Therefore, if false representations are made regarding matters of fact, and the *means of knowledge are at hand and equally available to both parties*, and the party, *instead of resorting to them, sees fit to trust himself in the hands of one whose interest it is to mislead him*, the law, in general, will leave him where he has been placed by his own imprudent confidence.

*Id.* at 571-72, 29 S.E.2d at 858 (quoting *Lake*, 90 Va. at 723).

In fact, when two parties are dealing at arm's length regarding the sale of property, it is the duty of the buyer to make inquiry regarding the true status of affairs and his failure to do so is negligence. *Id.* at 571, 29 S.E.2d at 858; *see also Poe*, 196 Va. at 826, 86 S.E.2d 47 (where buyers of house were given opportunity to make full and complete examination of true condition of house and furnace, it was their duty "to take advantage of the opportunity and ascertain the true condition of the premises and, having failed to do so, they cannot now avail themselves of the alleged misrepresentations").

"[I]f the parties have equal means of information, so that, with ordinary prudence or diligence, either may rely on his own judgment, they are presumed to have done so; or, if they have not done so, they must abide the consequence of their own folly or carelessness." *Costello*, 182 Va. at 571, 29 S.E.2d at 858; *but cf. Horner v. Ahern*, 207 Va. 860, 866, 153 S.E.2d 216, 220 (1967) (plaintiff buyers were not charged with knowledge of condition of house where termite

18

damage was "hidden" and plaintiffs had no "opportunity to examine into the real facts").

The Virginia Supreme Court does not shrink from this long-standing rule: "The common law affords to every one reasonable protection against fraud in dealing, but does not go to the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information." *Costello*, 182 Va. at 571, 29 S.E.2d at 858. Neither can a plaintiff claim that his reliance was reasonable and justified when he makes a partial inquiry, with full opportunity of complete investigation, and elects to act upon the knowledge obtained from the partial inquiry. *Hitachi*, 166 F.3d at 629; *see also Harris v. Dunham*, 203 Va. 760, 127 S.E.2d 65, 71-72 (1962).

The Virginia Supreme Court's decision in *Harris v. Dunham* is instructive. Dunham, an experienced businessman, purchased a business from plaintiffs. *Id.* at 771, 127 S.E.2d at 72. Similar to DNM's claim, the "gist of Dunham's complaint … was that it was misrepresented to him that the corporation 'was in good condition and would bring in a net profit of $25,000.00 per year.'" *Id.* at 770-71, 127 S.E.2d at 72. Like the case at hand, Dunham inquired of the officers about the financial affairs of the business, specifically, whether the business would pay $25,000.00 a year as plaintiffs claimed. *Id.* at 768, 127 S.E.2d at 70. The Court found that Dunham "made a partial inquiry, with full opportunity of complete investigation and ascertainment of all the facts, and then elected, not to exhaust the readily available sources of information, but to act upon the knowledge obtained from his partial inquiry." *Id.* at 769, 127 S.E.2d at 71.

The Court explained: "The evidence before us shows conclusively that Dunham had a full opportunity to investigate completely, with readily available sources of information. Had he taken advantage of his opportunity and elected to exhaust the available information, he could

easily have discovered those things which he now says were misrepresented to and concealed from him." *Id.* The court held that Dunham was therefore precluded from relying upon the misrepresentation of plaintiffs, and was barred from recovery. *Id.* at 767, 127 S.E.2d at 70.

Plaintiff in this case admits that it initiated an investigation of the alleged misrepresentations by requesting Mr. Pruitt's tax records. This fact alone precludes plaintiff from relying upon any alleged misrepresentations. Moreover, even if plaintiff had not requested such information, the failure to obtain the financial information of the business prior to entering into the Sales Agreement precludes plaintiff's reliance upon any alleged misrepresentations regarding the financial condition of the business. The facts as alleged by plaintiff embody "circumstances where a prudent buyer would have conducted an investigation" such that "a buyer who fails to make such an investigation may not assert fraud based on the factual misrepresentation." *See Hoover Universal, Inc. v. Brockway Imco, Inc.*, 809 F.2d 1039, 1044 (4th Cir. 1987).

**III.   THE ALLEGED MISREPRESENTATIONS WHICH FORM THE BASIS FOR PLAINTIFF'S FRAUDULENT INDUCEMENT CLAIM (COUNT I) WERE NOT INCLUDED IN THE SALES AGREEMENT AND ARE PRECLUDED BY THE MERGER CLAUSE IN THE SALES AGREEMENT.**

Plaintiff cannot allege or prove reasonable reliance on the alleged representations concerning Mr. Pruitt's income, as no such representations or warranties were included in the Sales Agreement. *See* Sales Agreement ¶¶ 5-6 (setting forth representations and warranties concerning marketable title to assets and Pruitt's Seafood's filing and payment of taxes, and covenants concerning transfer of assets free and clear of encumbrances). Notably, the parties did not include any representations, warranties, or covenants concerning the income which had been or would be derived from employment with or ownership of the business and did not require presentation of any tax returns for Mr. Pruitt. The Sales Agreement contains a broad integration

and merger clause, and it would be improper for the Court to permit a fraudulent inducement claim to proceed based upon alleged representations that the parties did not feel were important enough to include in the Sales Agreement. Under these circumstances, it would be unreasonable as a matter of law for plaintiff to rely on any such extra-contractual representations.

IV.    **THE REPRESENTATIONS, WARRANTIES, AND AGREEMENTS SET FORTH IN THE SALES AGREEMENT ONLY SURVIVED FOR THREE MONTHS FOLLOWING SETTLEMENT UNDER THE AGREEMENT AND CANNOT SERVE AS THE BASIS FOR CLAIMS IN THIS LITIGATION.**

Plaintiff's attempt to make out claims based upon the alleged breach or inaccuracy of representations and agreements fails as a matter of law because (a) the representations and agreements set forth in the Sales Agreement only survived for three months following settlement under the Agreement, and (b) plaintiff did not assert these claims until 13½ months after closing under the Sales Agreement. Therefore, the Court should dismiss plaintiff's claims.

Paragraph 13 of the Sales Agreement provides:

**Survival of Representations, Warranties, and Agreements.** The representations, warranties, indemnities, and agreements set forth and/or made pursuant to this Agreement shall remain operative and shall survive the settlement under this Agreement for three (3) months.

Settlement occurred under the Sales Agreement on May 4, 2004. *See* Complaint ¶ 13. The three-month survival period therefore expired on August 4, 2004. Plaintiff did not file the Complaint until September 27, 2005, or more than 13½ months after expiration of the survival period. There is no allegation that plaintiff asserted any claim for breach or inaccuracy of any representations or agreements during the survival period, and these claims are barred as a matter of law. *See Gressman v. Thibault*, 249 Va. 244, 248-49, 455 S.E.2d 512, 515 (1995) (where contract contained plain and unambiguous provision that terms, conditions, warranties and representations contained in contract survived closing only for a specified period of time, Court

21

determined plaintiff was not entitled to a greater right of rescission than existed under the language of the contract).

**V.    PLAINTIFF WAIVED ANY CLAIMS BASED ON THE ASSIGNMENT OF THE LEASE (COUNT II: FAILURE OF CONSIDERATION AND RESCISSION) BECAUSE THE SALES AGREEMENT PROVIDED THAT THE REMEDY FOR NON-ASSIGNMENT WAS TO DECLARE THE SALES AGREEMENT NULL AND VOID PRIOR TO CLOSING UNDER THE AGREEMENT.**

Plaintiff's failure of consideration claim is premised on the assertion that the Sales Agreement "was subject to the parties obtaining assignment of the existing dock lease agreement between seller and the District of Columbia as agent for the United States government." *See* Complaint ¶ 22. In fact, paragraph 9 of the Sales Agreement sets forth contingencies concerning the lease:

> **9.    Contingencies.** This Agreement is subject to the following contingencies, non-satisfaction of any or all of which on or before the settlement date shall entitle either party to hold this Agreement null and void in its entirety:
>
> a)    The parties obtaining assignment of the existing lease agreement for the Premises from the District of Columbia Government; and,
>
> c)    Purchaser and Purchaser's attorney being satisfied with the terms and conditions of the existing lease agreement for the Premises. Purchaser and Purchaser's attorney shall be given ten (10) days immediately following ratification of this Agreement to review the lease agreement.
>
> In the event that either party holds this Agreement null and void in its entirety due to non-satisfaction of any of the aforesaid contingencies, Purchaser shall be entitled to receive any and all monies paid hereunder forthwith. In the event that Purchaser holds this Agreement null and void for any reason other than the aforesaid contingencies, Seller shall be entitled to receive the Deposit.

Plaintiff admits that the parties closed the transaction on May 4, 2004, without obtaining approval of the lease assignment. *See* Complaint ¶ 23. The Sales Agreement contemplated but one remedy if approval of the lease assignment could not be obtained before settlement – plaintiff could "hold the Agreement null and void." DNM elected not to do so and instead has operated the business for more than 16 months before attempting to use the assignment issue as a

basis for rescission. Rescission is not an available remedy under these circumstances, and the Court should dismiss Count II with prejudice. *See Gressman*, 249 Va. at 248-49, 455 S.E.2d at 515; *see also* Part IV, *supra* (regarding failure to seek rescission during three-month survival period for representations, warranties, and agreements under Sales Agreement).

## VI.    PLAINTIFF'S EQUITABLE CLAIMS ARE BARRED BY THE DOCTRINE OF LACHES.

The doctrine of laches prevents plaintiff from seeking rescission in this case. Prompt action is essential when one believes himself entitled to a rescission of a contract. *Miller v. Reynolds*, 216 Va. 852, 856-57, 223 S.E.2d 883 (1976); *Wright, Inc. v. Shackleford*, 152 Va. 635, 643, 148 S.E. 807 (1929); *West End Co. v. Claiborne*, 97 Va. 734, 752, 34 S.E. 900, 906 (1900). "[I]f such rescission is not sought within a reasonable time the right to rescind is lost." *Miller*, 216 Va. at 856-57.

Laches likewise bars plaintiff's fraudulent inducement claim. Because a contract tainted with fraud is voidable, rather than void, promptness of action is required by the deceived party upon his discovery of the fraud. *West End*, 97 Va. at 752, 34 S.E. at 906. The law in Virginia is well settled: "The person who has been misled is required, as soon as he learns the truth, with all reasonable diligence to disaffirm the contract or abandon the transaction, and give the other party an opportunity of rescinding it, and of restoring both of them to their original position." *West End*, 97 Va. at 752, 34 S.E. at 906-07 (quoting 2 Pom. Eq. Jur. § 893); *see also Rouzie v. Dangerfield*, 97 Va. 708, 710-11, 34 S.E. 899, 900 (1900). The reason for this rule is clear: "He is not allowed to go on and derive all possible benefits from the transaction, and then claim to be relieved from his own obligations by a rescission or a refusal to perform on his own part." *West End*, 97 Va. at 752, 34 S.E. at 907 (quoting 2 Pom. Eq. Jur. § 893). "If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it

23

were still subsisting and binding, he thereby waives all benefit of and relief from the misrepresentations." *Id.*; *see also Rouzie*, 97 Va. at 711, 34 S.E. at 900.

Plaintiff entered into the Sales Agreement in May 2004. Plaintiff did not file this action seeking rescission of the Agreement until September 2005. Although plaintiff has failed to allege when it "discovered" the alleged misrepresentation, plaintiff has for more than one year and four months, gone on to derive all possible benefits from the transaction, and has conducted itself as though the agreement was subsisting and binding. Therefore, plaintiff has waived all benefit of and relief from the alleged misrepresentation.

## VII. PLAINTIFF'S BREACH OF CONTRACT CLAIM (COUNT III) BASED ON THE CONDITION OF VESSELS IS INCONSISTENT WITH AND IS PRECLUDED BY THE TERMS OF THE SALES AGREEMENT.

DMN seeks damages for breach of contract in Count III based on the alleged condition of barges and a cook-boat. DNM specifically references Paragraph 6(a) of the Sales Agreement in support of this claim. *See* Complaint ¶ 27. Paragraph 6(a) provides as follows:

> **6.      Covenants of Seller.** The Seller covenants with the Purchaser as follows:
>
> a)      The Bill of Sale, Affidavit of No Creditor, and instruments of assignment to be delivered at the settlement will transfer all of the Assets free and clear of all encumbrances, and will contain the usual warranties and affidavit of title. **The equipment, furniture and fixture conveyed shall be in good working order, reasonable wear and tear excepted, on the settlement date and the Seller agrees to make all necessary repairs to the equipment, furniture and fixture in the event it is found at the time of settlement to be not in working order. Purchaser shall be allowed to inspect the equipment, furniture and fixture the day before the settlement at its own costs and expenses.** (Emphasis added.)

Plaintiff seeks to recover $800,000 in damages for the alleged unseaworthiness of the vessels some 18 months after settlement and more than a year after expiration of the "representations, warranties, indemnities, and agreements set forth" in the Sales Agreement. *See* Sales Agreement ¶. Because of the provision in the Sales Agreement regarding inspection, Plaintiff is precluded

as a matter of law from bringing this claim. *See Smith v. Nonken*, 2000 WL 33179850, *4-5 (Va. Cir. 2000) (copy attached) (where contract contained express warranty that equipment "will be in working order at the time of settlement," but also provided for pre-settlement inspection "to verify that the condition of the Property conforms to this contract," the court found that plaintiff's signature on the contract demonstrated her "knowledge of the facts basic to the exercise of the rights given under the contract" and supported its finding that plaintiff knowingly waived her contractual warranty rights).

**Conclusion**

For these reasons, Defendants, Pruitt's Seafood, Inc., and Stewart B. Pruitt, by counsel, respectfully move this honorable Court to grant Defendants' Motion to Dismiss, to dismiss Plaintiff's Complaint with prejudice, and to grant additional relief as appropriate.

PRUITT'S SEAFOOD, INC.
STEWART B. PRUITT

By:_____/s/_____
                **Of Counsel**

Karen A. Doner (#458626)
WILLIAMS MULLEN
8270 Greensboro Drive, Suite 700
McLean, VA  22102
(703) 760-5200
(703) 748-0244 (Fax)

William F. Devine (Va. Bar No. 26632)
David A. Greer (Va. Bar No. 24128)
Kendra J. Jarrell (Va. Bar No. 65583)
WILLIAMS MULLEN HOFHEIMER NUSBAUM
1700 Dominion Tower
Post Office Box 3460
Norfolk, Virginia  23514-3460
(757) 622-3366
(757) 629-0700 (Fax)

**Certificate Of Service**

      I HEREBY CERTIFY that on this 8th day of November, 2005, a copy of the foregoing

document was sent via electronic filing, to:

> Simon M. Osnos, Esq.
> 7700 Leesburg Pike, #434
> Falls Church, VA  22043
> Counsel for Plaintiff

_____/s/_____

Karen A. Doner

1064374v1