UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DNM ENTERPRISES, INC.,                          :
                                                :
     Plaintiff,                                 :
                                                :
                                                :    Civil No. 05-2181EGS
     vs.                                        :    Judge E.G. Sullivan
                                                :
                                                :
PRUITT'S SEAFOOD, INC., et al.                  :

### PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

     Plaintiff opposes the defendants' motion to dismiss for the reasons herein stated.

For convenience, this opposition utilizes the same numbering as the motion to dismiss.

### I. PLAINTIFF HAS NOT STATED CLAIM FOR FRAUDULENT INDUCEMENT

### A. TIME, PLACE AND CONTENT OF ALLEGED FALSE STATEMENTS

     1. Defendants generally argue that the plaintiff's fraud claim is not set out with

sufficient particularity in that the allegations fail to identify the claimed

misrepresentations as to time, place and content. Memorandum, p.10. Specifically,

defendants argue that plaintiff has (a) opted to paraphrase Mr. Pruitt's alleged

statements rather than to state the words spoken, and (b) omitted the exact time of the

alleged misstatements. Memorandum, p.12.[1]

     2. Review of the complaint indicates that the allegations inform the defendants

of the identity of the person who made the allegedly false statements, the approximate

time of the statements, and the content of the statements. Under Virginia law (although

District of Columbia law may govern as discussed infra), the test for sufficiency of a

_____

    [1]The defense arguments that materiality, reliance, knowledge of falsehood, intent, and reliance
are conclusively absent from the pleadings, as augmented by submission of the parties' contract, will be
dealt with infra.

fraud pleading is whether the adverse party could be "taken for surprise" or whether instead, the pleading makes the adverse party "fully aware of the nature" of the case. Cook v. Hayden, 183 Va. 203, 209, 31 S.E.2d 625, 627 (1944).

3. When a complaint contains sufficient allegations of material facts to inform a defendant of the nature and character of the claim, it is unnecessary for the pleader to descend into statements giving details of proof. When the complaint is drafted so that defendant cannot mistake the true nature of the claim, if a defendant desires more definite information, or a more specific statement of the grounds of the claim, the defendant should request the court to order the plaintiff to file a bill of particulars. See CaterCorp, Inc. v. Catering Concepts, Inc., 246 Va. 22, 24, 431 S.E.2d 277, 279 (1993).[2]

4. The several elements of a cause of action for fraud are: (A) a false representation, (B) of a material fact, (C) made intentionally and knowingly, (D) with intent to mislead, (E) reliance by the party misled, and (F) resulting damage. Van Deusen v. Snead, 247 Va. 324, 327, 441 S.E.2d 207, 209 (1994). Thus, under Virginia law, to the extent it applies, plaintiff has pled a prima facie case, by identifying the basic content of the misrepresentations ($1,000,000.00 prior annual net income, Complaint, ¶11), materiality ($3,000,000.00 contract price based on income claims, Complaint, ¶17), knowledge of falsehood and intent to deceive ((Complaint, ¶¶10-11), reliance (Complaint, ¶10), and resulting damage (Complaint, ¶¶17, 19).

---

[2]The federal equivalent would be a motion for more definite statement under FRCP 12(f).

5. Defendants cannot claim ignorance of the substance or timing of the matters with which they are charged.  The Exhibit A affidavit of defendant Stewart Pruitt, principal of defendant PSI, attached to the venue transfer motion, relates apparent familiarity with "preliminary discussions" between him and plaintiff's principal Sung Jin Kim. According to the affidavit, at ¶2, Pruitt is able to recall 3-4 meetings with Kim in the District at the business site, 2 meetings at the office of defendants' accountant in Accomac, Virginia and "many discussions . . . over the telephone while I was either at my house in Nassawadox, Virginia or on my cellular phone driving from my business to my home."

6. Plaintiff has alleged at ¶5 that the defendants' misrepresentations took place during a 2-year period of negotiation leading up the April 28, 2004 sale of the Pruitt's Seafood business.  Since defendant Pruitt evidently recalls many of these "preliminary discussions" which are at the heart of the plaintiff's fraud claim, it is disingenuous to argue that the complaint fails to advise the defendants of the basic nature of the claim.

7. Regardless of Virginia law, It is plaintiff's position that, under Virginia conflict rules, District of Columbia law must govern this action.  Virginia follows the orthodox rule that the substantive rights of the parties are governed by the law of the situs where the tort occurred. McMillan v. McMillan, 219 Va. 1127, 253 S.E.2d 662 (1979).  Here, the alleged misrepresentations were made in the District, the underlying transaction is the sale of the assets of a District business by a District corporation to a District corporation for continued operation in the District, with the resultant harm having an impact in the District. Also see Insteel Industries, Inc. v. Costanza Contracting Co., Inc., 276 F.Supp.2d 479, 486 (E.D.Va. 2003).

3

8. Plaintiff has adequately pled a fraud claim under District of Columbia law, i.e., (1) a false representation, (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action taken in reliance upon the representation. D'Ambrosio v. Colonnade Council of Unit Owners, 717 A.2d 356, 361 (D.C.,1998)

9. The allegation that a fraudulent misrepresentation was made to a condominium unit buyer "prior to purchasing" his unit was a sufficient indicator of the time of the alleged fraud. D'Ambrosio v. Colonnade Council of Unit Owners, idem, at 361. Similarly, Under FRCP 9(b), a fraud which occurs over a period of time is adequately pled by outlining the time period over which the fraud occurred. United States ex rel. McCready v. Columbia/HCA Healthcare Corp., 251 F.Supp.2d 114, 117 (D.D.C.2003).

10. Under either District or Virginia law, defendants' objections to the "paraphrasing" of the alleged misrepresentations regarding income, and omission of the "exact time" of the misrepresentations, are insufficient to justify dismissal of this case.

11. Defendants also argue that fraud cannot be discerned from the complaint, as plaintiff's allegation that it was defrauded by defendants' false statements regarding earnings levels prior to the asset sale, is based on its experience operating the business after acquisition of the business assets. Memorandum, pp.13-14. It is clear that precise information as to the past earnings of defendant Stewart Pruitt from his affiliation with and/or control of Pruitt Seafoods, Inc. is within defendants' control and cannot be ascertained with particularity without inspection of business records through discovery. Under federal law, pleadings "on information and belief," which form the gist of plaintiff's allegations, are permitted when necessary information lies within the

4

defendants' control, such allegation is made in the complaint, and facts are pled to demonstrate a defendant's control over the information. Craftmatic Securities Litigation v. Kraftsow, 890 F.2d 628 (3rd Cir.1989); Kowal v. MCI Communications Corp., 16 F.3d 1271 (D.C.Cir.1994).[3]

12. Whatever the rules of pleading require under FRCP 9(b), under general principles of diversity jurisdiction, local law should determine whether a removed complaint sets forth a proper cause of action. There is no citation from defendants to either Virginia or District law to indicate that a complaint of fraud based on information and belief must specifically allege control over necessary information by the defendant, or the basis for the complainant's assertion that the defendant controls the information.

13. Accordingly, under decisional law of Virginia and the District identifying the required elements of a fraud claim, the complaint does state a cause of action. Also see Christakos v. Lockwood, 181 F.2d 805, 86 U.S.App.D.C. 323 (1950), aff'd after remand, 194 F.2d 897, 90 U.S.App.D.C. 211 (C.A.D.C.1952) upholding a claim of fraud in the purchase of a business where the purchaser concluded she had been defrauded by representations as to prior income, based on post-closing operation of the business.[4]

---

[3]Courts examining the issue have concluded that leave to amend should be granted to allow the claimant to allege specifically that the necessary information lies within the opponent's control, accompanied by a statement of facts on which the pleader bases the claim, and leave should be liberally granted to amend. Anderson v. USAA, 221 F.R.D. 250 (D.D.C.2004).

[4]This federal case is controlling authority in the District under M.A.P. v. Ryan, 285 A.2d 310 (1971), ruling that Court of Appeals decisions rendered prior to February 1, 1971 are binding legal authority in the District of Columbia.

B. <u>MATERIALITY</u>

14. Defendants argue that the alleged false statements as to business income prior to execution of the contract cannot be material because, were income representations material, such would appear in the contract, which itself contains a recital (a "merger" clause according to defendants), that there are no agreements outside those incorporated in the contract document. <u>Memorandum</u>, p.14. This argument is contradictory to the holding in the first <u>Christakos v. Lockwood</u> case, at 181 F.2d 805, 807, 86 U.S.App.D.C. 323, 325 (C.A.D.C. 1950) confirming that a defrauded party can prevail regardless of the merger clause, by proving fraud in the inducement.

> [Th]e plaintiff was confronted with the problem of vitiating the effect of a clause in the bill of sale by which she warranted that no representations of any kind were made to her and that she relied on her own independent investigation. The authorities are equally clear, in such cases, that the party seeking relief from the effect of such a clause must show fraud in the inducement or execution.

15. As stated in <u>Hubert v. Apostoloff</u>, 278 F. 673, 676 (E.D.New York), cited as authority in the first <u>Lockwood v. Christakos</u> case:

> Defendant claims that, when a contract states that it is made under representations therein expressed, other representations cannot be alleged, in the absence of proof that a party to it was deceived as to the contents of the contract, or otherwise prevented from ascertaining the same. It has been decided that the contract is void because it was procured by defendant's fraud; it follows that plaintiff cannot be estopped from setting forth the truth by anything contained in the contract itself.

16. <u>See also Strand v. Griffith</u>, 97 F. 854, 858 (8th Cir.1899), cited as authority in <u>Lockwood v. Christakos</u>:

> The written contract contains the unusual and suspicious declarations which we have quoted, and which would seem to have no other purpose than to back up a fraudulent transaction. The object of reducing contracts to writing is to prevent, not to promote or to protect, fraud. In the case of

Hofflin v. Moss, 32 U.S.App. 200, 14 C.C.A. 459, 67 Fed. 440, we had
occasion to consider somewhat similar provisions in a contract, and we said:
'And the clause in a contract, 'that no representation, understanding, or
agreement not in this contract shall bind either party, unless in writing, and
signed by both parties, as this is the complete agreement of the parties
hereto,' is of no avail to the plaintiff. This clause, to the extent that it is
valid, expresses no more than the law would imply without it. False and
fraudulent representations made by one party to a contract, by which the
other party is induced to enter into the contract, render it voidable, at the
election of the defrauded party; and a stipulation in such a contract to the
effect that the false and fraudulent representations by which the one party
induced the other to enter into it shall not affect its validity is itself of no
validity.

17.   The law in the District of Columbia is clear:  no written disclaimer or waiver

can operate as a bar to a claim of fraud in the inducement.   To the extent Virginia law

would apply, the law appears to be similar, as summarized in Bank of Montreal v.

Signet Bank , 193 F.3d 818, 828 -829 (C.A.4 (Va.),1999):

"While ... contracting parties may waive their contractual rights and
disclaim or limit certain liabilities, a 'false representation of a material fact,
constituting an inducement to the contract, on which the purchaser had a
right to rely, is always ground for rescission of the contract by a court of
equity' " or an action for damages in a court of law. George Robberecht
Seafood, Inc. v. Maitland Bros. Co., 220 Va. 109, 255 S.E.2d 682, 683
(1979) (quoting Wilson v. Carpenter's Adm'r, 91 Va. 183, 21 S.E. 243, 244
(1895)). George Robberecht is based on the rationale that the tort of fraud
in the inducement precedes the contract, so a contractual waiver of
liability is ineffective. Id. at 683 (waivers of warranties "stand[ ] no higher
than the contract which is vitiated by the fraud." (quoting Packard Norfolk
v. Miller, 198 Va. 557, 95 S.E.2d 207, 213 (1956). Thus, the Participation
Agreement does not as a matter of contract law bar a claim for fraud
regardless of whether the fraud is based on intentional
misrepresentations, reckless misrepresentations, or even innocent
misrepresentations associated with a claim for constructive fraud. See
Hitachi Credit, 166 F.3d at 630; Packard Norfolk, 95 S.E.2d at 210, 213
(allowing claim for constructive fraud in the inducement despite

7

contractual disclaimers).[5]

18.  To the extent defendants suggest that misrepresentations as to income in the context of a business sale are not per se material, see 27 A.L.R.2d 14, §3 (ordinarily it is held that representations concerning past or present profits or income regarding the subject matter of a contract are material).

## C.  FALSE STATEMENT MADE INTENTIONALLY AND KNOWINGLY

19.  Defendants argue that the complaint fails to allege intentional and knowing misrepresentation.  At ¶10 plaintiff alleges that defendant Stewart Pruitt made "intentional, malicious and material misrepresentations" and at ¶18 plaintiff alleges that such misrepresentations are chargeable to the corporate defendant.

20.  The element of knowledge on the part of Pruitt and his principal, PSI, is readily inferable from the allegation that the purported misrepresentations were made by Pruitt regarding his income "from employment with, and ownership interest in, Pruitt's Seafood, Inc."  Complaint, ¶11.  Under Superior Court Civil Rule 8(e), and its federal counterpart, technical forms of pleading are not required, pleadings shall be construed so as to do substantial justice, and therefore, a charge of fraud may be made by stating the facts from which the fraud or mistake would necessarily be implied. Defendants' knowledge of falsehood is Inherent in the allegation of intentional and malicious misrepresentation, as one could not intend to make a false statement without the required knowledge of falsehood.

---

[5]Robberecht involved the sale of an airplane in "as is" condition, with a written waiver by the purchaser of any warranty, condition or guaranty."  The Supreme Court allowed the purchaser to plead fraud in the inducement as the basis for a claim for damages.  The court observed that, while contracting parties may waive their contractual rights and disclaim or limit certain liabilities, a false representation of a material fact is always ground for rescission by a court of equity.

8

### D. INTENT TO MISLEAD

21.  The intent to mislead is readily inferable from the plaintiff's allegations that defendants, in order to induce plaintiff's purchase, made intentional and malicious misrepresentations about past and current earnings of the seafood business.  In the context of a business sale, an intent to mislead is readily inferable from allegations of false representations concerning earnings during the negotiation process.

### E. RELIANCE

22.  Defendants argue that plaintiff "has alleged no facts to demonstrate that its reliance upon the alleged representation was reasonable and justified, as required by law." Memorandum, p.16.  Plaintiff has alleged reasonable reliance on defendants' misrepresentations at ¶10 of the complaint.  Defendants offer no authority for the proposition that a factual description of the mental processes resulting in reliance must be pled in order to set forth a prima facie cause of action for fraud.  Further substantive argument regarding the reliance element of a cause of action for fraud will we made infra at Section II.

### F. RESULTING DAMAGE

23.  Defendants argue that there can be no damage resulting from fraud in this case, because plaintiff has failed to articulate the required elements of a prima facie case.  Clearly, if the court finds that the plaintiff has set forth a prima facie case, defendants' argument on this point is without merit.

### II. CLAIMED RELIANCE WAS UNREASONABLE

24.  The reasonableness of the reliance upon a misrepresentation is a question of fact, for which disposition by summary judgment is generally inappropriate.  Cassidy

v. Owen, 533 A.2d 253, 256 (D.C.1987).  A fortiori, the matter cannot be resolved

pursuant to a motion to dismiss.

25.  While defendants have excerpted various general statements of law from

several Virginia cases dealing with reliance, including the effect of failure to investigate,

partial investigation, equal access to information, and the duty to investigate,

Memorandum, pp. 17-20, none of the cited cases indicate that reliance is anything

other than a factual matter to be resolved at trial.  Indeed, the Circuit Court case cited at

p.17, Lowe's Island Ltd. Partnership v. NVKettler Limited Partnership, 1991 WL 835182

(Va.Cir.1991)(at p.4) supports plaintiff's position that reliance is a fact issue for trial:

> The terms and provisions of a contract cannot be used to defeat a fraud
> claim where the fraud has vitiated the contract. The contract terms and
> provisions can stand no higher than the contract which is vitiated by the
> fraud. Robberecht, 220 Va. at 112; Packard Norfolk v. Miller, 198 Va. 557,
> 565 (1956). If the Agreements are vitiated by fraud, then the provisions
> thereof are not binding on the Complainants. However, the language of
> the Agreements can be considered as notice to the Complainants of
> Kettler's intentions as to the subject property. The provisions may not be
> binding on the Complainants as a matter of law, but they may be evidence
> that tend to show that the Complainants could not have reasonably relied
> on the false representations. *This is an issue for the trier of fact to decide.*

26.  Clearly, there is no record evidence at this point to establish whether plaintiff

had equal access to defendants' financial information, whether partial investigation by

the plaintiff precludes reliance on Stewart Pruitt's statements, whether a reasonable

person would have believed Pruitt's representations, whether ordinary care and

prudence were or were not exercised by plaintiff, and whether, in the end, plaintiff did

reasonably rely on the claimed misrepresentations.  Thus, dismissal of the plaintiff's

fraud claim is premature.

10

III. FRAUD CLAIM PRECLUDED BY "MERGER CLAUSE"

27. Defendants' argument that plaintiff is precluded as a matter of law from relying on any false statement by virtue of the "integration and merger" clause contained in the contract is incorrect and has been addressed at ¶¶13-16 of this memorandum, supra.

IV. NON-SURVIVAL OF REPRESENTATIONS AND WARRANTIES

28. Defendant argues that plaintiff's claims are barred in their entirety because ¶13 of the Sales Agreement provided that the PSI defendant-seller's representations, warranties, indemnities and agreements survived the closing for a period of three (3) months only.

29. The contract representations and warranties are not an issue as to plaintiff's fraud claim, since the claim is based, not on the representations, warranties, indemnities and agreements contained in the contract, but rather, on fraudulent misrepresentations which, while they induced the contract, were made outside the contract.

30. As for plaintiff's claim for rescission due to non-assignment of the lease, plaintiff's claim is not based on a representation, warranty, indemnity or agreement of the Sales Agreement, which, at ¶9 conditioned settlement upon the District's approval for the dock lease assignment, but rather, failure of a condition subsequent which was expressed not in the Sales Agreement, but separately on the parties' Settlement Statement (Exhibit 1) wherein it is stated: "Seller agrees to cooperate in good faith with Buyer in obtaining assignment of lease from District of Columbia government."

11

31. Because the dock lease assignment approval was not obtained prior to closing per the Sales Agreement, the parties dealt with non-occurrence of this major contingency by making the approval a condition subsequent at closing, outside of the Sales Agreement.  The parties clearly intended that the asset sale would not be concluded at closing.  The Settlement Statement bears the caption "Per Management Agreement," a separate document executed at closing (Exhibit 2) by which plaintiff was authorized by defendant PSI "to manage the property to be operated under the name Pruitt Seafood located at Main [sic] Ave., S.W., Washington, D.C. 20004, and to operate the same in accordance with the laws of the District of Columbia."

32. The purpose of the "Management Agreement" was obviously to circumvent the proscription of ¶19 of the dock lease (Exhibit 3) which provided: "Tenant shall not assign, transfer, mortgage or otherwise encumber this lease or sublet or otherwise permit others to use all or any part of the Premises . . . without the prior written consent of Landlord, which Landlord may withhold in its absolute discretion."

33. The "Management Agreement" itself specified that it would terminate upon the later of (a) 60 days, or (b) approval of the lease assignment.  As the "Management Agreement" has expired, under which plaintiff was relegated to a managerial, non-ownership or defeasible ownership status, and the condition subsequent lease assignment securing the presence of the seafood business at the Maine Avenue waterfront has not been consummated, the 90-day period specified in the Sales Agreement for survival of representations, warranties, indemnities and agreements,

12

does not apply to bar plaintiff's rescission claim.[6]

34. As for plaintiff's claims for defects in the vessels, a defect which existed as of the settlement date, is covered by the seller's covenant at ¶6(a) that all equipment shall be in "good working order" as of the settlement date. The implication that defects which were not detected prior to closing are not covered by the seller's warranty is wrong, as numerous defects which were not apparent on inspection surfaced afterwards, during the 90-day post-settlement period during which the warranty was effective.

35. The fact that plaintiff's claim was not made during the 90-day survival period does not, per se, vitiate the seller's covenant to be responsible for defects existing as of settlement, detected by the plaintiff, post-settlement, prior to expiration of the 90-day warranty.

## V. WAIVER OF LEASE ASSIGNMENT CONTINGENCY

36. Defendants argue that plaintiff waived the lease assignment contingency since the Sales Agreement allowed the plaintiff to "hold the Agreement null and void" if the contingency was not satisfied prior to closing. This argument is incorrect due to the execution and conditions of the "Settlement Statement (Per Management Agreement)(Exhibit 1) and the Management Agreement (Exhibit 2), which, under plaintiff's view of the case, were intended to change the lease assignment contingency from a condition precedent, to a condition subsequent.

---

[6]Plaintiff has made reasonable efforts to obtain consent from the District and as of July 18, 2005 had executed and returned the prescribed assignment form to the District (Exhibit 4). Still, to date, the District has not manifested its consent to the assignment.

VI. LACHES

37. Defendants correctly observe that rescission must be asserted in a timely manner. However, each case where rescission is claimed "must be decided in the light of the peculiar facts shown." Parker v. Inge, 157 Va. 592, 601,161 S.E. 884, 887 (1932). For that reason, the court cannot at this time determine that the plaintiff as a matter of law is untimely in seeking to rescind the transaction due to (a) non-assignment of the dock lease, or (b) fraud. As a further matter, the doctrine of laches would in no way preclude plaintiff from prosecuting its fraud claim for compensatory damages, which has clearly been presented within the applicable statute of limitations (3 years in the District, 2 years in Virginia).

VII. CLAIMS BASED ON DEFECTIVE VESSEL CONDITIONS

38. Plaintiff's claim for defects related to vessel seaworthiness is not barred, as defendants argue, by ¶6(a) of the Sale Agreement which provided for inspection of the equipment prior to closing to verify conformity with the warranty that all equipment would be in "good working order," and repair of any existing defects by the seller-defendant PSI. Defendants' position is based on the assumption that defects which were not detected by pre-settlement inspection, but which became apparent during the 90-day survival period, are not covered by the warranty.

39. The Virginia case cited by defendants, Smith v. Nonken, 2000 WL 33179850 (Va.Cir.2000) is not apposite. There, the home buyer, who had a right to a pre-settlement inspection, sued regarding heating system defects, but was denied recovery, having executed a pre-settlement inspection document stating that purchaser "had inspected the property, accept[s] it in its present condition," and acknowledging

14

that the sellers had "fulfilled their obligations" under the sale contract.

    40.  The Sales Agreement and related settlement documents in this case, unlike the paperwork in <u>Smith v. Nonken</u>, do not contain any recitation that the occurrence of settlement conclusively establishes seller's compliance with the ¶6(a) warranty regarding the condition of the equipment as of closing.

    41.  For the foregoing reasons, defendants' motion to dismiss must be denied.

/s/_____

Simon M. Osnos [D.C.Bar 295006]
7700 Leesburg Pike, #434
Falls Church, Virginia 22043
703-356-8233

## CERTIFICATE OF SERVICE

    On November 14, 2005, a copy of the foregoing was sent first class mail to defense counsel as follows:

Karen Doner
Williams Mullen
8270 Greensboro Drive, Suite 700
McLean, Virginia 22102

/s/_____

Simon M. Osnos

Exhibit 1

## SETTLEMENT STATEMENT (Per Management Agreement)

**Due to Seller:**

| | |
|---|---|
| Purchase Price | $ 3,000,000.00 |
| Inventory (p.o.c.) | |
| Lease Security Deposit | $      2,666.66 |
| **Total Due to Seller:** | **$ 3,002,666.66** |

**Deductions:**

| | |
|---|---|
| Promissory Note I | $   150,000.00 |
| Promissory Note II | $ 2,200,000.00 |
| Rent Adjustment (5/01-03/04) | $          30.30 |
| **Total Deductions:** | **$ 2,350,030.30** |

**Total Cash to Seller:**                           **$   652,636.36**

**Due from Purchaser:**

| | |
|---|---|
| Purchase Price | $ 3,000,000.00 |
| Inventory (p.o.c.) | |
| Lease Security Deposit | $      2,666.66 |
| **Total Due from Purchaser:** | **$ 3,002,666.66** |

**Deductions:**

| | |
|---|---|
| Promissory Note I to Seller | $   150,000.00 |
| Promissory Note II to Seller | $ 2,200,000.00 |
| Rent Adjustment (5/01-03/04) | $          30.30 |
| **Total Deductions:** | **$ 2,350,030.30** |

**Net Cash from Purchaser:**                      **$   652,636.36**

** The parties hereto hereby agree to adjust taxes, utilities, and other items to be adjusted between themselves.   The undersigned hereby acknowledge the receipt of this Statement this 3rd day of May, 2004.   Seller agrees to cooperate in good faith with Buyer in obtaining assignment of lease from District of Columbia Government.

(signature on the next page)

1

SELLER:                                      PURCHASER:
PRUITT SEAFOOD, INC.                         DNM SEAFOOD, INC.


By: President, Steward B. Pruitt             By: President, Sung J. Kim

Exhibit 2

# MANAGEMENT AGREEMENT

May 3, 2004

Pursuant to terms of the Sales Agreement dated as of April 28, 2004, by and between **Pruitt's Seafood, Inc.** ("Seller"), and **DNM Seafood, Inc.** ("Purchaser"), and in order to comply with the rules and regulations of the District of Columbia acting on behalf of the United States of America, Purchaser is hereby authorized to manage the property to be operated under the name "Pruitt Seafood" located at 1100 Main Ave, S.W., Washington, D.C. 20004, and to operate the same in accordance with the laws of the District of Columbia.

The authority granted hereby will cease automatically upon the occurrence of the earlier of (i) the valid assignment of the Lease Agreement entered into by and between Seller and the District of Columbia acting on behalf of the United States of America, or (ii) the expiration of sixty (60) days from the date of this Agreement.

**PRUITT'S SEAFOOD, INC.**

By: _Steven B Pruitt_

Title: _President_

**DNM SEAFOOD, INC.**

By: _[signature]_

Title: _President_

#446435 v1 - Pruitt - Management Ageement

Exhibit 3

# LEASE AGREEMENT

THE DISTRICT OF COLUMBIA,
acting on behalf of THE UNITED STATES OF AMERICA,

LANDLORD

and

PRUITT'S SEAFOOD, INC.,
a Virginia corporation,

TENANT

for

Premises Nos.1, 2, 3, and 4
Municipal Fish Wharf

B.    Throughout the Term, Tenant shall maintain, with a company licensed to sell insurance in the District of Columbia, (i) commercial general liability insurance (the "Liability Policy") with limits of at least One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate combined for all locations in which Tenant operates its business in a form providing occurrence basis coverage; and (ii) an all-risk policy of insurance covering the Barges and all trade fixtures, equipment and personal property kept at the Premises, in an amount not less than the full replacement value of said items. All such insurance policies shall (i) be written as primary coverage and not contributing with or in excess of any coverage that Landlord may carry; (ii) contain an express waiver of any right of subrogation by the insurer against Landlord; and (iii) provide that the insurance policy may not be cancelled unless Landlord has been given thirty (30) days' prior written notice. Notwithstanding the foregoing, the Liability Policy shall be increased at the end of each period of five (5) Lease Years during the Term by an amount equal to the increase in the Consumer Price Index during such period. In addition, Tenant's Liability Policy shall (i) list as additional insured Landlord and any other parties with an insurable interest in the Premises designated by Landlord, and (ii) be endorsed to require the insurance carrier to notify Landlord in writing of any losses charged against the policy. Before the Term commences, and before any such insurance policy expires, Tenant shall deliver to Landlord a certificate of insurance for each policy or renewal thereof that Tenant is required to maintain under this Section. If Tenant fails to maintain any insurance required by this Section, Landlord may obtain such insurance, and any premium paid by Landlord shall be immediately payable by Tenant to Landlord as additional rent.

C.    Neither party shall be liable to the other or to any insurer (by way of subrogation or otherwise) for any loss or damage, even though such loss or damage may have been occasioned by the negligence of such party, if such loss was covered by an insurance policy containing an endorsement to the effect that any such release by the insured shall not adversely affect the insured's right to recover for such loss, and that the insurer waives its right of subrogation.

## 18.    *[Intentionally Omitted].*

## 19.    *Assignment and Subletting.*

A.    Tenant shall not assign, transfer, mortgage or otherwise encumber this Lease or sublet or otherwise permit others to use all or any part of the Premises, whether voluntarily, by operation of law or otherwise (collectively, an "Assignment"), without the prior written consent of Landlord, which Landlord may withhold in its absolute discretion. However, Landlord shall not withhold its consent if such assignee, transferee, subtenant or occupant (collectively, the "Assignee") is financially capable of satisfying its obligations under this Lease, and shall have previously and successfully sold seafood at retail. Any attempted Assignment shall be void and confer no rights upon any third party. If an Assignment is effected in violation of the terms of this Lease, Landlord may collect rent from the Assignee and apply the net amount collected to the rent herein reserved, but no such Assignment or collection shall be deemed a waiver of this covenant, acceptance of the Assignee as tenant, or release of Tenant hereunder. In addition, if Landlord consents to an Assignment, Tenant shall pay Landlord One Thousand and No/100 Dollars ($1,000.00) (the "Assignment Fee") as payment for legal fees and costs incurred in connection with

the preparation of the documents to effectuate the Assignment. The Assignment Fee shall be paid to Landlord prior to the preparation of the Assignment documents. The following events shall also constitute an Assignment:  (a) if Tenant is a corporation, the transfer of more than fifty percent (50%) of the voting stock of Tenant, or (b) if Tenant is a partnership, the transfer of more than fifty percent (50%) of the partnership interests of Tenant or the transfer of any general partnership interest of Tenant. This clause shall not be interpreted to preclude an Assignment to siblings and direct descendants of individuals owning, as of the Commencement Date, a majority of the voting stock of Tenant, or a transfer to a new entity as a result of a reorganization that does not result in a change in beneficial ownership.

        B.     If Landlord approves an assignment or subletting, Tenant shall pay to Landlord, as and when received by Tenant, an amount equal to 50% of the difference between (i) all sums paid to Tenant by or on behalf of such assignee or subtenant under the assignment or sublease, and (ii) the Rent paid by Tenant under this Lease and attributable to the portion of the Premises assigned or sublet.

        C.     In addition to the foregoing, if Tenant notifies Landlord that Tenant desires to assign a portion of this Lease or sublet a portion of the Premises (the "Proposed Sublet Space"), Landlord shall have the option to regain possession of the Proposed Sublet Space and amend this Lease to exclude the Proposed Sublet Space and effect a proportionate reduction in Minimum Rent and Tenant's Proportionate Share based upon the relative size of the Premises as so reduced. All other terms and conditions of this Lease shall remain in effect and applicable to the Premises as reduced, and Tenant shall execute documents to effect such amendment at Landlord's request. If Landlord does not exercise its right to regain possession of the Proposed Sublet Space, Tenant may seek an acceptable assignee or subtenant for a sublease term no longer than that set forth in Tenant's notice. If Tenant does not find an assignee or subtenant acceptable to Landlord within 120 days from the date of Tenant's most recent notice, Tenant may not enter into any assignment or sublease without first submitting a new notice to Landlord and affording Landlord an opportunity to amend or terminate this Lease as set forth above.

## 20.     *[Intentionally Omitted]* .

## 21.     *Tenant's Defaults.*

        Tenant shall be in default under this Lease if Tenant (a) fails to pay any rent or other sum required hereunder within twelve (12) days after its due date; or (b) fails to maintain any insurance required hereunder; or (c) abandons the Premises or fails to conduct business therein for a period of fifteen (15) or more consecutive days, absent a casualty and then only after allowing a period of as much as six (6) months in which to replace the affected Barge; or (d) assigns this Lease or sublets all or any portion of the Premises in violation of Section 19; or (e) fails to continue to operate its existing businesses on Barges 2, 3, and 4; or (f) files for relief under the United States Bankruptcy Code (the "Bankruptcy Code") or under any other state or federal bankruptcy or insolvency law, or Tenant files an assignment for the benefit of creditors, or if an involuntary proceeding under the Bankruptcy Code or under any other federal or state bankruptcy or insolvency law is commenced against Tenant; or (g) defaults in any other obligation herein and such default is not remedied within thirty (30) days after written notice of the default from Landlord; provided,

Exhibit 4



## WILLIAMS MULLEN
### HOFHEIMER NUSBAUM

John L. Deal
Direct Dial: 757.629.0616
jdeal@williamsmullen.com

July 12, 2005

BY FEDERAL EXPRESS

Hyunsik Lim, Esquire
Moon, Park & Associates
7617 Little River Turnpike, Suite 930
Annandale, Virginia 22003

      Re:    Assignment & Assumption of Lease Agreement

Dear Mr. Lim:

      Enclosed are three (3) original copies of the Assignment & Assumption of Lease Agreement which were signed by my client, Stewart B.Pruitt, along with one (1) photocopy . My client may have kept the fourth original for his file, so it is acceptable to return the photocopy to us once it is signed by your client and The District of Columbia.  Under separate cover I am sending to Mr. Ridley a photocopy of the agreement along with our client's check in the amount of $1,000.00 to cover the administrative costs.

      Please have your client sign these documents and forward them to Mr. Ridley.  Please feel free to let me know of any concerns.

               Very Truly Yours,

               John L. Deal

JLD/m

Enclosures

cc:  Andrew Earl Ridley, Esq.

*A Professional Corporation*

**VIRGINIA • WASHINGTON, D.C. • LONDON**
Dominion Tower, Suite 1700  999 Waterside Drive  P.O. Box 3460  Norfolk, VA 23514-3460  Tel: 757.622.3366  Fax: 757.629.0660
www.williamsmullen.com

# MOON, PARK & ASSOCIATES

ILRYONG MOON (VA, MD, DC)
SANG KUEN PARK (VA, MD)
HYUNSIK LIM (VA, MD, DC)
SEA YOUNG WOO (VA, NY)

ATTORNEYS AT LAW
7617 LITTLE RIVER TURNPIKE
SUITE 930
ANNANDALE, VIRGINIA 22003

TELEPHONE (703) 941-7395
FACSIMILE (703) 941-6252

July 18, 2005

**VIA FEDERAL EXPRESS**

Andrew Ridley, Esquire
DC Dept. of Housing and Community Development
801 North Capitol Street, N.E., 8th Floor
Washington, DC 20002

      Re:   DNM Seafood, Inc
             t/a Pruitt's Seafood
             1100 Main Avenue, S.W.
             Washington, DC 20024

Dear Mr. Ridley:

      Enclosed please find four (4) original Assignment and Assumption of Lease executed by both assignor and assignee. Please have appropriate authority sign the documents and return one (1) original each to Mr. Deal for the assignor and to this office for the assignee. I was told by Mr. Deal that he has already sent you the $1,000.00 check for the assignment fee.

      If you have any question, please contact me at your convenience. Thank you.

                Sincerely,
                Moon, Park & Associates

                By: Hyunsik Lim

HL/hl
Encl.

DISTRICT OF COLUMBIA.

## ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT ("Assignment"), made and entered into as of the 30ᵗʰ day of ____JUNE____, 2005, by and between

PRUITT'S SEAFOOD, INC. (the "Assignor"), a Virginia corporation; and

DNM SEAFOOD, INC. (the "Assignee"), a District of Columbia corporation.

## RECITALS

WHEREAS, Assignor entered into a certain lease agreement (the "Lease Agreement" or "Lease") dated April 1, 2001, with the District of Columbia, a municipal corporation, acting as an agent for the United States of America, (the "Landlord"), demising the premises located at 1100 Main Avenue, SW, Washington, DC commonly known as Premises Nos. 1, 2, 3 and 4 of Municipal Fish Wharf (the "Premises"), for a term of thirty (30) years commencing on the New Rent Commencement Date as defined in the Lease Agreement, a copy of which Lease Agreement is attached hereto and made a part hereof; and

WHEREAS, the Assignor is referred to as "Tenant" in the said Lease Agreement; and

WHEREAS, the Assignor desires to assign and convey, insofar as its title enables it to legally so do, its leasehold interests in the Premises and the Lease Agreement to the Assignee, and the Assignee does agree to accept such assignment and conveyance and assume all of the rights, obligations and duties of the Assignor therein described in the said Lease Agreement; and

WHEREAS, the Landlord desires to grant its consent to this Assignment and Assumption of Lease Agreement, but expressly subject to the conditions set forth herein and in the Lease Agreement, with no intent on part of the Landlord or Assignor/Tenant to further modify any other terms and conditions of the Lease Agreement; and

WHEREAS, the Assignor and Assignee, with the consent of the Landlord, desire to modify certain terms of the Lease only in the manner contained in this Assignment.

## WITNESSETH: THAT

NOW, THEREFORE, for and in consideration of One Dollar ($1.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto

agree as follows: to wit,

1.     The above Recitals are incorporated herein and made a part of the terms and conditions of this Assignment.

2.     The Assignor does hereby assign, transfer, and convey to the Assignee all the right, title, and interest that Assignor has or may have under the Lease Agreement to have and to hold the same unto the Assignee, its successors, and assigns, for and during the remainder of the term of the Lease Agreement, and any renewals or extensions therein provided, subject to the terms, covenants, conditions, and agreements contained herein and in the Lease Agreement.

3.     The Assignee does hereby accept this Assignment of Lease and agree to assume all of the duties which the Assignor is/was obligated to perform under the Lease Agreement including, but not limited to, the payment of rent and other charges, for the balance of the term thereof and any renewals or extensions of the term(s) of the Lease, maintenance of the premises, and operation of the fish selling business and other limited business operations for the demised premises in the described manner.

4.     The Assignee warrants and represents to Landlord and Assignor that Assignee is a valid corporation in good standing in the District of Columbia, has demonstrated the financial capacity, and has the legal capacity, as such, to fully perform the obligations required under the said Lease Agreement.

5.     The Assignor hereby represents and warrants to the Assignee that the Lease Agreement is in full force and effect and no breaches or defaults exist as of the date of execution of this Assignment and with further warranty that Assignor shall pay or cause to be paid to Landlord a sum of One Thousand Dollars ($1000.00) as consideration in connection with Landlord's consent to an Assignment of the Lease Agreement, as prescribed under Article 19(A) of the said Lease Agreement.

6.     The parties hereto agree that the security deposit under the Lease Agreement in the amount of $2,666.66 shall be held for the account of the Assignee from the Effective Date of this Assignment. The Effective Date of this Assignment shall be the date when the Landlord indicates Landlord's consent to this Assignment, evidenced by Landlord's execution in the appropriate space on this Assignment, as described in Article 8 of this Assignment.

7.     The Assignor and Assignee shall, jointly or separately, notify or cause the Landlord to be notified that, as of the Effective Date of this Assignment, all notices prescribed under the said Lease Agreement shall be sent to Assignee at the following address:

> ATTN:  Mr. Sung J. Kim, President
> DNM Seafood, Inc.
> t/a Pruitt's Seafood
> 1100 Main Avenue, S.W.
> Washington, DC 20024

8.     The Assignor and Assignee understand and agree that this Assignment shall not become

effective unless and until the Landlord shall indicate its consent and agreement to this Assignment, evidenced by the signature of the Mayor of the District of Columbia to this Assignment.

**IN WITNESS WHEREOF,** Pruitt's Seafood, Inc. has caused this Assignment and Assumption of Lease Agreement to be executed its corporate name by Stewart B. Pruitt, its President, and attested by Jeff Pruitt, its Secretary, and its seal to hereunto affixed and does hereby constitute and appoint Stewart B. Pruitt its true and lawful Attorney-in-Fact for it and in its name to acknowledge and deliver this Assignment as its act and deed as of the __30ᵗʰ__ day of ___JUNE___, 2005.

ASSIGNOR:

ATTEST:

**PRUITT'S SEAFOOD, INC.**
By,

_____        _____ (Seal)
Jeff Pruitt, Secretary                    Stewart B. Pruitt, President

(Corporate Seal)

## *ACKNOWLEDGMENT*

State of Virginia
County of _____ } ss:

I, _____, a Notary Public in and for the said District of Columbia, do hereby certify that Stewart B. Pruitt, who is named as Attorney-in-Fact for Pruitt's Seafood, Inc. in the foregoing and annexed Assignment and Assumption of Lease Agreement, bearing date the ____day of _____, 2005, personally appeared before me in the said jurisdiction, and the said Stewart B. Pruitt is personally well known to me as the person named as Attorney-in-Fact in the said Assignment and Assumption of Lease Agreement for Pruitt's Seafood, Inc., acknowledged said Assignment and Assumption of Lease Agreement to be the act and deed of the said Pruitt's Seafood, Inc., and that he delivered the same as such.

GIVEN under my hand and seal this 30ᵗʰ day of June_____, 2005.

_____
Notary Public

(Notarial Seal)

My Commission Expires: __My Commission Expires September 30, 2005__

**IN WITNESS WHEREOF**, DNM Seafood, Inc. has caused this Assignment and Assumption of Lease to be executed its corporate name by Sung J. Kim, its President, and attested by Yong W. Kim, its Secretary, and its seal to hereunto affixed and does hereby constitute and appoint Sung J. Kim its true and lawful Attorney-in-Fact for it and in its name to acknowledge and deliver this Assignment as its act and deed as of the _15th_ day of _July_, 2005.

ATTEST:

                                                      ASSIGNEE:

                                                      **DNM SEAFOOD, INC.**
                                                      By,

_____          _____ (Seal)
Yong W. Kim, Secretary                            Sung J. Kim, President

(Corporate Seal)

## *ACKNOWLEDGMENT*

State of _Virginia_
County of _Fairfax_  } ss:

I, _Mihee Lee_, a Notary Public in and for the said District of Columbia, do hereby certify that Sung J. Kim, who is named as Attorney-in-Fact for DNM Seafood, Inc. in the foregoing and annexed Assignment and Assumption of Lease Agreement, bearing date the _15th_ day of _July_, 2005, personally appeared before me in the said District of Columbia, and the said Sung J. Kim is personally well known to me as the person named as Attorney-in-Fact in the said Assignment and Assumption of Lease Agreement for DNM Seafood, Inc., acknowledged said Assignment and Assumption of Lease Agreement to be the act and deed of the said DNM Seafood, Inc., and that he delivered the same as such.

GIVEN under my hand and seal this _16th_ day of _July_, 2005.

_____
Notary Public

(Notarial Seal)

My Commission Expires: _12/31/08_



MIHEE LEE
Notary Public
Commonwealth of Virginia
My Commission Exps. Dec. 31, 2008

**CONSENTED AND AGREED TO** as of the ___ day of _____, 2005.

_____            **LANDLORD:**

ATTEST:                            THE DISTRICT OF COLUMBIA, a municipal
                                   corporation, acting as agent for THE UNITED
                                   STATES OF AMERICA

_____            By: _____(Seal)
Secretary.                              ANTHONY A. WILLIAMS
                                        Mayor of the District of Columbia

(District of Columbia Seal)

Approved for Legal Sufficiency:

_____
Assistant Attorney General          Date: _____
for the District of Columbia

### *ACKNOWLEDGMENT*

**District of Columbia, ss:**

I, _____, a Notary Public in and for the said District of Columbia, do hereby certify that Anthony A. William, Mayor, who is named as Attorney-in-Fact for the District of Columbia, acting as an agent for the UNITED STATES OF AMERICA, in the foregoing and annexed Assignment and Assumption Agreement, bearing date the ____ day of _____, 2005, personally appeared before me in the said District of Columbia, and the said Anthony A. Williams is personally well known to me as the person named as Attorney-in-Fact in the said Assignment and Assumption of Lease Agreement for the District of Columbia and acknowledged said Assignment and Assumption of Lease Agreement to be the act and deed of the said District of Columbia, and that he delivered the same as such.

GIVEN under my hand and seal this _____ day of _____, 2005.

_____
Notary Public

(Notarial Seal)
My Commission Expires: _____